REDACTED – NONCONFIDENTIAL

David R. Wright (Bar No. 5164)
    dwright@mabr.com
Kirk R. Harris (Bar No. 100221)
    kharris@mabr.com
Jared J. Braithwaite (Bar No. 12455)
    jbraithwaite@mabr.com
MASCHOFF BRENNAN
201 South Main Street, Suite 600
Salt Lake City, UT 84111
Telephone: (435) 252-1360
Facsimile:  (435) 252-1361

Attorneys for Plaintiff LIFETIME PRODUCTS, INC.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF UTAH
# NORTHERN DIVISION

| | |
|---|---|
| **LIFETIME PRODUCTS, INC.,** a Utah corporation, <br><br> Plaintiff, <br><br> v. <br><br> **RUSSELL BRANDS, LLC D/B/A SPALDING,** a Delaware limited liability company, <br><br> Defendant. | Civil No. 1:12-cv-00026-DN-EJF <br><br> **LIFETIME'S OPENING CLAIM CONSTRUCTION BRIEF** <br><br> **(Originally filed under seal November 21, 2014; Docket No. 211)** <br><br> Chief District Judge David Nuffer <br><br> Magistrate Judge Evelyn Furse <br><br> (Jury Demanded) |

In accordance with the Court's scheduling order,[1] plaintiff Lifetime Products, Inc. ("Lifetime") respectfully submits its opening claim construction brief regarding the construction of disputed claim terms identified in the Joint Claim Construction and Prehearing Statement.[2]

This case involved three asserted patents directed toward home basketball assemblies in a field dominated by plaintiff Lifetime and defendant Russell Brands, LLC ("Russell").[3] In January 1999, Lifetime filed a patent application on a novel way of attaching basketball backboards to backboard frames using adhesive rather than the prior-art method using double-sided tape. The USPTO granted U.S. Patent Nos. 7,749,111 ("the '111 patent"); 8,033,935 ("the '935 patent"); and 8,038,550 ("the '550 patent") to Lifetime, which are now asserted against Russell in this action. The parties dispute the meaning of terms used in those patents.[4] Lifetime asks the Court to resolve those disputes and presents its brief in support of its positions.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... iv

TABLE OF EXHIBITS ........................................................................................................ vi

CONSTRUCTION OF CLAIM TERMS .................................................................................. 1

    1.    The level of ordinary skill in the art does not include specific education related to the composition, properties, or performance of adhesives. ...................................... 2

    2.    "Adhesive" and "Non-Tape Adhesive" claim terms do not include double-sided tape. ........................................................................................................................ 3

---

[1] Docket No. 196.

[2] Docket No. 204.

[3] Russell is the successor-in-interest to Spalding, which is the successor-in-interest to Huffy. For purposes of this memo, Lifetime will refer to Russell, Huffy, and Spalding interchangeably.

[4] *See* Docket No. 204. Rather than present the terms in alphabetical order as in the Joint Statement, Lifetime presents logically-related terms together.

3.    "Sized and Configured for Playing the Game of Basketball"; "adhesive provides"; and "sufficient" claim terms have plain and ordinary meanings and are not indefinite. .........................................................................................7

    A.    A finding of patent invalidity for indefiniteness presents a high burden that Russell cannot meet. ........................................................................8

    B.    The prosecution history and specification show that the allegedly indefinite terms were added to clarify the scope of the claims..........................10

    C.    Evidence shows that those of skill in the art are familiar with the allegedly indefinite language and reasonably understand its meaning..............................13

4.    "Acrylic" and "acrylic material" claim terms mean acrylic. ......................................14

5.    "Basketball Backboard" is a plain and ordinary term to basketball backboard manufacturers................................................................................15

6.    "Elastomeric" should be construed according to the parties' previously-agreed construction....................................................................................16

7.    "Catalyzed [adhesives]" do not necessarily comprise two-parts—"two-part catalyzed adhesives" do. ...................................................................17

8.    "Silicone adhesive" and "silicon-based adhesive" claim terms would be understood by those of skill in the art according to their plain and ordinary meanings. ...................................................................................19

9.    "Bond gap"; "bond gap spacers"; and "defined bond gap" claim terms do not imply a pre-calculated distance for a bond gap. .........................................21

10.    "Frame" and "frame structure" are plain and ordinary terms to basketball backboard manufacturers for a structure that supports the backboard. ....................24

11.    "Printed image" and "printing an image" claim terms are plain and clear.................25

CONCLUSION...................................................................................... 25

# TABLE OF AUTHORITIES

<span style="letter-spacing:0.1em">**CASES**</span>

*Application of Spiller,*
   500 F.2d 1170, 182 U.S.P.Q. 614 (C.C.P.A. 1974) .................................................. 9

*Application of Venezia,*
   530 F.2d 956 (C.C.P.A 1976) ..................................................................................... 9

*Beachcombers Int'l, Inc. v. Wildewood Creative Products, Inc.,*
   31 F.3d 1154 (Fed. Cir. 1994) ................................................................................... 19

*Becton, Dickinson & Co. v. Tyco Healthcare Group, LP,*
   616 F.3d 1249 (Fed. Cir. 2010) ................................................................................. 19

*Braintree Labs., Inc. v. Novel Labs., Inc.,*
   749 F.3d 1349 (Fed. Cir. 2014) ................................................................................... 9

*CardSoft v. Verifone, Inc.,*
   769 F.3d 1114 (Fed. Cir. Oct. 17, 2014) .................................................................... 6

*Custom Accessories, Inc. v. Jeffrey–Allan Industries, Inc.,*
   807 F.2d 955 (Fed. Cir. 1986) ..................................................................................... 2

*Enzo Biochem, Inc. v. Applera Corp.,*
   599 F.3d 1325, 94 USPQ2d 1321 (Fed. Cir. 2010) ............................................... 7, 9

*Exxon Research & Eng. Co. v. U.S.,*
   265 F.3d 1371 (Fed. Cir. 2001) ................................................................................... 8

*Harris Corp. v. IXYS Corp.,*
   114 F.3d 1149, 43 U.S.P.Q.2d 1018 (Fed. Cir. 1997) .......................................... 6, 25

*In Application of Echerd,*
   471 F.2d 632 (C.C. P.A. 1973) .................................................................................... 9

*In re Packard,*
   751 F.3d 1307 (Fed. Cir. 2014) ................................................................................. 12

*Interval Licensing LLC v. AOL, Inc.,*
   766 F.3d 1364 (Fed. Cir. 2014) ................................................................................... 9

*Invitrogen Corp. v. Biocrest Mfg., L.P.,*
   424 F.3d 1374 (Fed.Cir. 2005) .................................................................................... 9

*Microsoft Corp. v. i4i Limited Partnership,*
   131 S.Ct. 2238 (2011) .................................................................................................. 8

*Nautilus, Inc. v. Biosig,*
   __ U.S. __, 134 S.Ct 2120 (2014) ......................................................................... 8, 12

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)................................................................ 1, 2, 5, 16

*Seachange Int'l, Inc. v. C-COR, Inc.*,
    413 F.3d 1361 (Fed. Cir. 2005)................................................................ 6

*Seattle Box Co., Inc. v. Indus. Crating & Packing, Inc.*,
    731 F.2d 818 (Fed.Cir. 1984).................................................................. 9

*Unique Concepts, Inc. v. Brown*,
    939 F.2d 1558 (Fed.Cir.1991)................................................................ 6

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)................................................................ 1, 2

*Young v. Lumenis*,
    492 F.3d 1336 (Fed. Cir. 2007).............................................................. 8

## STATUTES

35 U.S.C. § 112.......................................................................................... 8

## OTHER AUTHORITIES

ASTM Designation D907-00, Standard Terminology of Adhesives (2000) ............................... 18

Merriam–Webster's Collegiate Dictionary (10th ed. 1998) ........................................ 20

## TABLE OF EXHIBITS

Exhibit 1    U.S. Patent No. 7,749,111 to Stevens.

Exhibit 2    U.S. Patent No. 8,033,935 to Stevens.

Exhibit 3    U.S. Patent No. 8,038,550 to Stevens.

Exhibit 4    Deposition transcript excerpts from the deposition of Larry Stevens,
             dated June 25, 2014.

Exhibit 5    Declaration under 37 C.F.R. § 1.132 Traversing Grounds for Rejection by
             S. Curtis Nye, dated January 10, 2013.

Exhibit 6    Declaration under 37 C.F.R. § 1.132 Traversing Grounds for Rejection by
             David C. Winter, dated January 10, 2013.

Exhibit 7    Deposition transcript excerpts from the deposition of Doug Sims,
             dated June 12, 2013.

Exhibit 8    Deposition transcript excerpts from the deposition of Ron White,
             dated June 14, 2013.

Exhibit 9    Deposition transcript excerpts from the deposition of Anthony Grinwald,
             dated November 10, 2014.

Exhibit 10   Amendment and Response to Office Action, dated March 6, 2001,
             from the prosecution history for U.S. Patent No. 7,749,111.

Exhibit 11   Office Action, dated October 21, 2010,
             from the prosecution history for U.S. Patent No. 8,033,935.

Exhibit 12   Office Action, dated June 7, 2011,
             from the prosecution history for U.S. Patent No. 8,033,935.

Exhibit 13   Office Action, dated October 20, 2010,
             from the prosecution history for U.S. Patent No. 8,038,550.

Exhibit 14   Office Action, dated June 7, 2011,
             from the prosecution history for U.S. Patent No. 8,038,550.

Exhibit 15   Response to Final Office Action Dated September 30, 2013, dated December 2,
             2013, from the reexamination history for U.S. Patent No. 7,749,111.

Exhibit 16   Patent Owner's Statement of the Substance of the Interview Conducted
             October 23, 2013, from the reexamination history for U.S. Patent No. 7,749,111.

Exhibit 17      U.S. Patent No. 6,468,373 to Grinwald et al.

Exhibit 18      U.S. Patent No. 5,677,896 to Nunes.

Exhibit 19      Office Action, dated August 16, 2000,
                from the prosecution history for U.S. Patent No. 7,749,111.

Exhibit 20      Office Action, dated December 6, 2000,
                from the prosecution history for U.S. Patent No. 7,749,111.

Exhibit 21      Amendment and Response to Office Action, dated March 21, 2011,
                from the prosecution history for U.S. Patent No. 8,033,935.

Exhibit 22      Amendment and Response to Office Action, dated July 1, 2011,
                from the prosecution history for U.S. Patent No. 8,033,935.

Exhibit 23      Amendment and Response to Office Action, dated March 21, 2011,
                from the prosecution history for U.S. Patent No. 8,038,550.

Exhibit 24      Amendment and Response to Office Action, dated July 1, 2011,
                from the prosecution history for U.S. Patent No. 8,038,550.

Exhibit 25      U.S. Patent No. 6,004,231 to Schickert.

Exhibit 26      U.S. Patent No. 6,312,350 to White.

Exhibit 27      ASTM Designation D907-00, Standard Terminology of Adhesives,
                bearing production control numbers RUSS00067897–67908.

Exhibit 28      Selection from Merriam–Webster's Collegiate Dictionary (10th ed. 1998).

Exhibit 29      Huffy Memorandum, dated March 19, 1999,
                bearing production control numbers RUSS00005289–5292.

Exhibit 30      Declaration of Jared J. Braithwaite in Support of Lifetime's Opening Claim
                Construction Brief, dated November 21, 2014.

Exhibit 31      Deposition transcript excerpts from the deposition of Edward M. Petrie,
                dated November 12, 2014 and CV of Edward M. Petrie.

Exhibit 32      Declaration of David Allen in Support of Lifetime's Opening Claim Construction
                Brief, dated November 21, 2014.

## CONSTRUCTION OF CLAIM TERMS

It is a "bedrock principle" of patent law that the claims of a patent, and not the examples set forth in the specification, define the patented invention.[5] The purpose of claim construction is to make an objective assessment about what a person of ordinary skill in the art at the time the patent was filed would have understood by the words in the claims.[6]

In interpreting the words in the claims, the focus is on "how the patentee used the claim term in the claims, specification, and prosecution history" (*i.e.*, the intrinsic record).[7] A patentee often uses words in a claim in the same way as those of ordinary skill in the relevant art, and therefore the words of a claim are "'generally given their ordinary and customary meaning.'"[8] Thus, "[t]he inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation."[9]

"[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art . . . as of the effective filing date of the patent application. . . . In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."[10] In other cases, however, the meaning of a claim term as understood by persons of skill in the art may not be immediately apparent, and additional sources must be

---

[5] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc).
[6] *Id.* at 1313, 1316–17, 1321–23.
[7] *Id.* at 1321.
[8] *Id.* at 1312 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).
[9] *Id.* at 1313.
[10] *Id.* at 1313–14.

consulted to determine what a person of skill in the art would have understood the term to mean; however, additional sources must not be used to "contradict any definition found in or ascertained by a reading of the patent documents."[11]

The written description is valuable in ascertaining the operative meaning of claim language. But it is usually erroneous to *confine* the claims to the embodiments disclosed in the specification, because it is the words of the claims that define the patented invention, not the embodiments provided in the specification, and because persons of ordinary skill "rarely would confine their definitions of terms to the exact representations depicted in the embodiments."[12]

## 1. The level of ordinary skill in the art does not include specific education related to the composition, properties, or performance of adhesives.

Claim construction starts with the level of ordinary skill in the art. Factors considered in determining the level of skill in the art include the type of problems encountered in the art, prior art solutions to those problems, sophistication of the technology, and educational level of active workers in the field.[13] Absent is what a hired expert thinks of the level of ordinary skill in the art.

Here, the "art" is basketball backboard assemblies, and those of skill in the art at Lifetime and Russell were mechanical or manufacturing engineers that did not have expertise in the formulation of adhesives.[14] Despite whatever Russell's designated expert might say about the level of skill in the art, those actually of skill in the art were mechanical or manufacturing

---

[11] *Id.* at 1314, 1322–23 (quoting *Vitronics*, 90 F.3d at 1584 n.6).

[12] *Id.* at 1323.

[13] *See Custom Accessories, Inc. v. Jeffrey–Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986).

[14] The inventor is a manufacturing engineer. Ex. 4, Stevens Depo. at pp. 6:14–15. Lifetime's other basketball backboard designers were mechanical and manufacturing engineers with experience in the design of basketball systems without specific education in adhesives. Ex. 5, Decl. of Curtis Nye at ¶ 1; Ex. 6, Decl. of David Winter at ¶ 1. The same is true of Huffy/Russell's engineers at the time of the invention. Ex. 7, Sims Depo. at pp. 19:18–21:2; Ex.8, White Depo. at ████████████ 37:19–40:13 ████████████.

engineers with experience designing basketball systems and did not have specific education related to the composition, properties, or performance of adhesives.

### 2.   "Adhesive" and "Non-Tape Adhesive" claim terms do not include double-sided tape.

| Lifetime's Constructions | Russell's Constructions |
|---|---|
| **Adhesive**: A substance that holds materials together by surface attachment, which does not include double-sided tape | **Adhesive**: Material, such as tape, epoxy, resin, and glue, that binds other materials together by surface attachment |
| **Non-tape [adhesive]**: A substance that holds materials together by surface attachment, which does not include double-sided tape | **Non-tape [adhesive]**: Any form of adhesive other than tape, including without limitation multiple part solvent liquid or paste, one part solvent liquid or paste, one part liquid solution, powder, film, hot melt, mastic, or spray |

The first terms subject to dispute are "adhesive" and the adjective "non-tape," which precedes the term "adhesive" in some claims. Lifetime's constructions are based on the patentee's use of the term adhesive in specific contrast the double-sided tape that was used to construct prior-art basketball backboards. Russell's construction ignores this specific use of the terms by the patentee. Accordingly, the core question for the Court in construing these terms is whether the term adhesive should be construed to include double-side tape when the patents describe adhesive in contrast and as a replacement to double-sided tape.

The background section of the specification of the asserted patents explains that "two-sided tape having a foam center" such as "'VHB' tape" was used before the invention to attach basketball backboards to metal frames.[15] The specification further teaches that double-sided tape was inferior at least because of "the time and labor required to apply the tape to the frame."[16] The Summary of the Invention section then explains that, in Lifetime's invention, an "adhesive"

---

[15] Ex. 1, '111 patent at cols. 1:26–27, 1:31–36, 2:48–50; *see also id.* at col. 4:37–61.
[16] *Id.* at col. 1:30–45.

"*replaces* conventional VHB double-sided tape."[17] Replacement of double-sided tape with adhesive is repeatedly taught throughout the specification.[18] Simply put, the specification describes double-sided tape as the problem, and "adhesive" as the solution. Use of the term adhesive in the patents is clearly and unmistakably in opposition to double-sided tape.

The prosecution histories also makes clear that the term "adhesive" in the context of the patent claims does not include double-sided tape. In distinguishing prior-art references describing use of double-sided tape, the patentee stated that the prior art "does not teach or suggest that elastomeric adhesive is a suitable alternative or equivalent to 'double-sided tape.'"[19] The applicant distinguished "adhesive" from the double-sided foam tape previously used in basketball backboard assemblies. The examiner repeatedly noted that "it is well known in the art to use double sided tape to secure the backboard to the frame" but that the admitted prior art "fails to clearly disclose the use of an adhesive to secure the device."[20] Thus, the Examiner understood that double-sided tape was not an "adhesive" in the context of the asserted patents.

"Non-tape adhesive" did not appear in the originally-issued claims of the asserted patents and was not added until after Russell requested reexamination of the asserted patents and presented its overly-broad view of the term "adhesive" to the examiner of the reexaminations of

---

[17] *Id.* at col. 1:57–58 (emphasis added).

[18] *See, e.g., id.* at col. 2:43–45 ("The elastomeric adhesive 20 replaces the VHB double-sided tape currently used with acrylic backboards."), 5:2–4 ("[T]he present invention … utilizes an elastomeric adhesive…to replace the conventional double-sided tape."). The specification also describes "adhesives" as requiring curing. Double-sided tape does not require curing, and is not an "adhesive" as that term is used in the claims. *See id.* at col. 1:64–67.

[19] Ex. 10, '111 Pros. History, Response to Office Action, dated Mar. 6, 2001, p. 6 (emphasis added); *See also id* at p. 6 ("if it were obvious to use elastomeric adhesive *instead of* double-sided tape, then others would have done so long ago to obtain manufacturing cost savings.").

[20] Ex. 11, '935 Pros. History, Office Action, dated Oct. 21, 2010, p. 5; *accord* Ex. 12 and  Ex. 13 (same with respect to the '935 and '550 patents.)

the asserted patents. Importantly, when Lifetime added the term "non-tape," it explicitly stated that "the wording 'non-tape adhesive' has the same scope and meaning as the wording 'adhesive' and merely reiterates the claimed invention does not include double-sided tape."[21]

But even if the Court were to use a definition for "adhesive" that included double-sided tape as a starting point, where a patent applicant makes a "clear and unmistakable" disclaimer of claimed subject matter, either in the specification or in the prosecution history, it is error to interpret the claims to include the disclaimed subject matter.[22] Here, the intrinsic evidence makes absolutely clear that the patentee used the term "adhesive" so as to exclude double-sided tape.

Further still, those of skill in the art at the time of the invention, including Russell/Huffy engineers, similarly understood that adhesive did not refer to double-sided tape. For example, in April 2000, Russell/Huffy filed a patent application in which Tony Grinwald was the first named inventor.[23] The Grinwald application claimed a basketball backboard with "an acrylic rebounding surface that is supported by and *adhesively* bonded directly to a molded plastic frame."[24] ███  ████████████████████████████████████████████████████████████  ██████████████████████████████████████ Thus, Russell's proposed constructions are contrary to its own basketball backboard engineer's understanding of

---

[21] Ex. 15, '111 Reexam. History, Response to Final Office Action Dated Sept. 30, 2013, dated December 2, 2013 at p. 12; *see also* Ex. 16, '111 Reexam. History, Patent Owner's Statement of the Substance of the Interview Conducted October 23, 2013 at p. 22.
[22] *Phillips*, 415 F.3d at 1316.
[23] This application issued as U.S. Patent No. 6,468,373.
[24] Ex. 17, U.S. Patent No. 6,468,373 at col. 1:8–11 (emphasis added).
█ ██████████████████████████████████

the term. Lifetime's expert, Edward Petrie, and adhesives expert agrees that those of skill in the art would not understand the term "adhesive" to include double-sided tape.[26]

Nonetheless, Russell will likely argue that Lifetime's constructions for "adhesive" and "non-tape adhesive" render the adjective "non-tape" meaningless or superfluous, which Russell will likely argue is contrary to the general claim construction principle that all claim limitations be considered meaningful.[27] However, general principles of claim construction operate as presumptions that do not trump the clear import of the specification.[28] Thus, the presumptive claim construction principles are not hard and fast rules and "will be overcome by a contrary construction dictated by the written description or prosecution history.[29] Likewise, here clear meaning of "adhesive" in the intrinsic record overcomes the presumption.

Lastly, Russell's motivation to construe "adhesive" to include double-sided tape is likely because the asserted patents would effectively invalidate themselves if that construction is adopted. Again, the patents describe the prior art method of using double-sided tape to construct backboards and specifically focus on the use of adhesive as an improvement over double-sided tape in backboard construction. The law of claim construction states that the Court should reject Russell's construction to avoid ensnaring prior art within the meaning of "adhesive."[30] The Court should therefore adopt Lifetime's proposed constructions of "adhesive" and "non-tape adhesive."

---

[26] Ex. 31, Petrie Depo at p. 10–12.
[27] *Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1562 (Fed.Cir.1991).
[28] *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1368–69 (Fed. Cir. 2005) ("claims that are written in different words may ultimately cover substantially the same subject matter")
[29] *Id.*; *see also CardSoft v. Verifone, Inc.*, 769 F.3d 1114, 1120 (Fed. Cir. Oct. 17, 2014) (reversing a district court for strict adherence to claim differentiation because it could not change the clear meaning of term in light of the specification).
[30] *See Harris Corp. v. IXYS Corp.*, 114 F.3d 1149, 1153, 43 U.S.P.Q.2d 1018 (Fed. Cir. 1997) .

**3.    "Sized and Configured for Playing the Game of Basketball"; "adhesive provides";
and "sufficient" claim terms have plain and ordinary meanings and are not indefinite.**

A number of the disputes between the parties on claim construction surround Russell

contentions that certain claim terms render the claims of the asserted patents indefinite. Russell's

contentions here are wholly inconsistent with its position that stayed this case for several months.

Russell requested that the asserted patents be reexamined by the USPTO, and argued to the Court

that the case should be stayed because the USPTO would find the asserted patents invalid.[31] Now

that the USPTO has rejected Russell's invalidity contentions, Russell argues it does not

understand what the patent claims mean because they are allegedly indefinite. These are wholly

inconsistent positions indicating that Russell's indefiniteness allegations are litigation-driven and

not caused by any real ambiguity in the patent claims.[32]

Russell contends that the following claim terms are allegedly indefinite: (1) "sized and

configured for playing the game of basketball"; (2) "adhesive provides [adhesion and flexibility]

/ [a bond] / [flexibility in the bond]"; (3) "sufficient adhesion and flexibility … to be used in the

game of basketball"; (4) "sufficient strength and flexibility … to be used in the game of

basketball"; and (5) "sufficient flexibility in the bond to dissipate impact energy from the acrylic

basketball backboard to the basketball backboard frame when a basketball strikes the backboard

when playing the game of basketball."[33]

---

[31] Docket No. 93.

[32] *Cf. Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1332 ("If a claim is indefinite, the claim, by definition, cannot be construed. Without a discernable claim construction, an [invalidity] analysis cannot be performed.")

[33] Russell contends that if not indefinite certain terms should be given another construction. Lifetime will address this argument when and if Russell actually presents it to the Court.

In other words, Russell contends that basketball backboard manufacturers would not understand what a basketball backboard is or whether a backboard is sufficiently constructed for use in the game of basketball. Thus, the question for the Court with respect these terms is whether Russell has presented clear and convincing evidence that one of skill in the art (a designer or manufacturer of basketball backboards) would fail to understand with reasonable certainty what a basketball backboard is and how it should perform.

### A.    A finding of patent invalidity for indefiniteness presents a high burden that Russell cannot meet.

The U.S. Supreme Court recently opined on the topic of indefiniteness in patent law, which makes indefiniteness the topic and defense *du jure* in patent cases. In *Nautilus, Inc. v. Biosig Instruments, Inc.* the Supreme Court stated that "a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."[34] This requirement for "definiteness" arises out of 35 U.S.C. § 112, which requires that the specification conclude with claims "particularly pointing out and distinctly claiming" that which the inventor regards as the invention. Finding a claim term "indefinite" also finds that the claim is invalid, and therefore Russell must prove indefiniteness by "clear and convincing evidence."[35]

Russell appears to take issue with the claim terms because they do not recite exact sizes (*e.g.*, in feet and inches) or exact force measurements. But this criticism is contrary to the

---

[34] __ U.S. __, 134 S.Ct 2120, 2124 (2014) abrogating *Exxon Research & Eng. Co. v. U.S.*, 265 F.3d 1371 (Fed. Cir. 2001). The *Nautilus* opinion changed the wording of the indefiniteness standard that had been used by the Federal Circuit since 2001 even though the Supreme Court recognized that the Federal Circuit's fuller explications of its standard may have accorded with the Supreme Court's rewording in *Nautilus. Id.* at 2030.
[35] *Young v. Lumenis*, 492 F.3d 1336, 1344–45 (Fed. Cir. 2007); *see also Microsoft Corp. v. i4i Limited Partnership*, 131 S.Ct. 2238, 2242 (2011).

requirements for claim definiteness. "Claim language employing terms of degree has long been found definite where it provided enough certainty to one of skill in the art when read in the context of the invention."[36] "[A] patentee need not define his invention with mathematical precision …."[37] Terms of degree are often found sufficiently definite when described according to functional criterion or a result to be obtained.[38] *In Application of Echerd*, the predecessor to the Federal Circuit analyzed claims directed to a material to be wrapped around pipe insulation that was "characterized by having sufficient flexibility and wet strength to permit the same to be wrapped when wet around insulated pipe surfaces … and having sufficient adhesive characteristics to firmly bond itself to such surfaces." The court stated that "[t]here is nothing intrinsically wrong in defining something by what it does rather than by what it is."[39] In *Enzo Biochem, Inc. v. Applera Corp.*, the court said that "[w]hen a 'word of degree' is used, the court must determine whether the patent provides 'some standard for measuring that degree.'"[40] The

---

[36] *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014).
[37] *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1384 (Fed.Cir. 2005).
[38] *See Application of Spiller*, 500 F.2d 1170, 1180, 182 U.S.P.Q. 614 (C.C.P.A. 1974) (claims reciting the presence of starch "in amounts sufficient to be capable of causing selective modification of surface properties" were not indefinite. "There is nothing indefinite in the use of claim language which defines particular amounts according to a functional criterion.");
[39] 471 F.2d 632, 635 (C.C. P.A 1973). *See also Application of Venezia*, 530 F.2d 956, 959 (C.C.P.A 1976) (reversing an indefiniteness finding regarding a claim limitation for a pair of sleeve structured or dimensioned to fit over the insulating jacket of a cable because the claim language was defined with a reasonable degree of precision and particularity.); *Braintree Labs., Inc. v. Novel Labs., Inc.*, 749 F.3d 1349, 1359–60 (Fed. Cir. 2014) (addressing the construction of patent claims regarding colonoscopy preparation, concluded that one of skill in the art would understand what a "copious" amount of diarrhea was without any further definition of volume).
[40] 599 F.3d 1325, 1336, 94 USPQ2d 1321 (Fed. Cir. 2010) (citing *Seattle Box Co., Inc. v. Indus. Crating & Packing, Inc.*, 731 F.2d 818, 826 (Fed.Cir. 1984)).

court reversed indefiniteness determinations because the limitations recited a degree of functional performance and examples from the specification that met the performance criteria.[41]

As described below, those of skill in the art with respect to basketball backboards understand the phrases that Russell contends are indefinite. Even if those of skill in the art were clueless regarding backboard design and construction, the specification provides an example of a material that provides sufficient construction characteristics for use in the game of basketball; namely, double-sided tape. One of skill in the art could at the very least compare the performance of an adhesively-secured backboard to a backboard attached with double-sided tape to determine whether the adhesively-secured backboard was sufficient for use in the game of basketball.

**B.    The prosecution history and specification show that the allegedly indefinite terms were added to clarify the scope of the claims.**

The claims reasonably apprise those skilled in the art of the scope of the invention when the claims are read in the context of the specification and prosecution history. The allegedly indefinite phrases were added to the claims of the '111 patent to distinguish over U.S. Patent No. 5,677,896 to Nunes, which discloses a "novelty desk lamp" that "simulates an actual basket assembly such [as] used in professional and college basketball" using a "miniature" basketball backboard, rim, and net.[42] Nunes also discloses that the miniature backboard may be mounted to a support surface (such as a cantilever arm or "a refrigerator") using "suitable mounting means"

---

[41] *Id.* at 1334–36. The court further stated that "claims are not indefinite even if some experimentation is required" to determine whether the performance falls within claim scope. *Id.*
[42] Ex. 18, U.S. Pat. No. 5,677,896 at Abstract; *see also id.* at cols. 1:32–36, 4:11–20.

such as a magnet, suction cups, hooks, or an "adhesive."[43] Thus, the examiner initially rejected Lifetime's claims based on Nunes and Nunes' reference to an "adhesive."[44]

In response, Lifetime amended the claims to require that the basketball backboard assembly be "sized and configured for playing the game of basketball" and that the adhesive "provides sufficient adhesion and flexibility to the acrylic backboard and frame structure bonding surfaces to be used in the game of basketball."[45] Stated simply, Lifetime's claims are directed to the *real* game of basketball not a toy or novelty item, and the invention is directed toward an adhesively-attached backboard that withstands the rigors of the game of basketball as opposed to wads of paper or a light foam ball.[46] When the claim language of the assertive patents is read in the context of the prosecution history, it becomes clear that the allegedly indefinite language merely means that the adhesive is strong enough and is flexible enough that the backboard can be used to play a *real* game of basketball.

The specification teaches that in order to successfully use a basketball backboard, "the backboard must be adequately bonded to a support frame" and "there must be sufficient flexibility in the bond to dissipate the impact energy from the backboard to the frame."[47] For example, "[i]f the bond between the backboard and frame is too rigid, then the backboard can fracture," and "[i]f the bond is too loose, then the adhesion fails."[48] The specification also explains that "VHB" "two-sided tape having a foam center" had adequate strength and

---

[43] *Id*. at col. 6:30–50.
[44] Ex. 19, '111 Pros. History, Office Action, dated Aug. 16, 2000, p. 2; Ex. 20, '111 Pros. History, Office Action, dated Dec. 6, 2000, p. 2.
[45] Ex. 10, '111 Pros. History, Response to Office Action, dated Mar. 12, 2001, p. 2.
[46] Ex. 18, U.S. Pat. No. 5,677,896 at cols. 6:67–7:8.
[47] Ex. 1, '111 patent at col. 1:23–27.
[48] *Id*. at col. 1:28–30.

flexibility, but required substantial "time and labor" to apply.[49] It then explains that Lifetime had

discovered adhesives that had "sufficient strength and flexibility, comparable to that obtained

with conventional foam-filled, two-sided tape."[50] Thus, the specification teaches that the ability

of an adhesive to provide the strength and flexibility for playing a *real* game of basketball can be

evaluated with reference to the strength and flexibility of conventional VHB double-sided tape.

Claims are examined for definiteness at the USPTO under much the same standard as

recited in *Nautilus*.[51] Thus, if there were any doubt as to the clarity of the patent claims, it was

resolved by the Examiner of the '935 and '550 patents. Those patents were originally submitted

with the language now in question. At one point the examiner rejected that language as being

"vague and indefinite."[52] In response, Lifetime contended that one skilled in the art would

understand the meaning of this language when it was read in light of the specification.[53] In

response, the examiner allowed the patents to issue. If there was any further concern about the

definiteness of claims, they would have been rejected as indefinite at some other point in the by

the many patent examiners and administrative patent judges that have reviewed them. The fact is

that the claims of the asserted patents have been found clear, understandable, definite, and

allowable despite extensive examination.

---

[49] *Id.* at col. 1:31–45.

[50] *Id.* at col. 2:48–50; *see also id.* at col. 5:4–5.

[51] *In re Packard*, 751 F.3d 1307, 1313 (Fed. Cir. 2014) ("The USPTO, in examining an application, is obliged to test the claims for reasonable precision…."); *see also id.* at 1310.

[52] Ex. 11, '935 Pros. History, Office Action, dated Oct. 21, 2010, pp. 2–3; Ex. 12 at pp. 2–3 (same); Ex. 13 at p. 2 (same with respect to '550 patent); Ex. 14 at p. 2 (same).

[53] Ex. 21, '935 Pros. History, Amendment and Response to Office Action, dated Mar. 21, 2011, pp. 9–13; Ex. 22 at pp. 9–14 (same); Ex. 23at pp. 6–9 (same with respect to '550 patent); Ex. 24 at pp. 6–9 (same).

**C.   Evidence shows that those of skill in the art are familiar with the allegedly indefinite language and reasonably understand its meaning.**

Real-world evidence confirms that the language in the claims is reasonably understandable to those of ordinary skill in the art. ████████████████████████████████████████

████████ And Lifetime's industry expert agrees that the terms are reasonably clear.[54]

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

────────────────────
[54] Ex. 32, Decl. of David Allen at ¶¶ 8–11.

█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████

Russell's patents use similar phrases to describe and teach its inventions to those of skill in the art using language describing backboard characteristics as "sufficient" and "withstand the rigors of basketball." For example, Russell's U.S. Patent No. 6,004,231 describes a basketball backboard frame "of plastic material having sufficient strength and rigidity to support the rebound member."[59] Russell's U.S. Patent 6,312,350 describes a basketball hoop that can have any cross-sectional shape "that provides suitable strength and rigidity, while being compatible with the objects of a basketball game."[60] And Russell's U.S. Patent No. 6,468,373 describes "a rebounding surface that is preferably an acrylic sheet … bonded directly to the frame in a manner that improves its ability to withstand the rigors of basketball play."[61]

The Court should find that that those of skill in the art understand the terms in accordance with their plain language in light of the specification and prosecution history of the asserted patents. The Court should also reject Russell's indefiniteness allegations because Russell cannot present clear and convincing evidence that the terms are indefinite and because its allegations are belied by the evidence presented herein.

**4.    "Acrylic" and "acrylic material" claim terms mean acrylic.**

| Lifetime's Constructions | Russell's Constructions |
| --- | --- |
| **Acrylic**:<br>Plain and ordinary meaning | **Acrylic**: Any acrylate-based plastic, whether or not containing a toughener or other modifier |
| **Acrylic material**:<br>Plain and ordinary meaning | **Acrylic material**: Any material made from any acrylate-based plastic whether or not containing a toughener or other modifier |

---

[59] Ex. 25, U.S. Patent No. 6,004,231, at Abstract.
[60] Ex. 26, U.S. Patent No. 6,312,350 at col. 12:7–12.
[61] Ex. 17, U.S. Patent No. 6,468,373 at col. 2:42–46.

The parties do not dispute that acrylic is an acrylate-based plastic. The question for the Court is whether Russell's additional language—"whether or not containing a toughener or other modifier"—is necessary when it fails to add any clarity to the construction and causes confusion.

Russell's additional language in its proposed construction is meaningless because it states that an acrylic can include a toughening material that is mixed into the acrylic or could be acrylic without any toughening material. Its construction might as well say that an acrylic can be blue, another color, or no color at all. Russell's proposed construction fails to add clarity to the terms and causes confusion by reference to tougheners or other modifiers, which have nothing to do with whether or not a material is acrylic.  Acrylic is acrylic—no further complexity is necessary.

**5.    "Basketball Backboard" is a plain and ordinary term to basketball backboard manufacturers.**

| Lifetime's Construction | Russell's Construction |
|---|---|
| **Basketball backboard**:<br>Plain and ordinary meaning | **Basketball backboard**: A brittle surface behind a basketball hoop |

The question for the Court regarding the construction of "basketball backboard" is whether one of skill in the art would think that a basketball backboard could only be constructed of a brittle material. As context, the parties both manufacture basketball backboards made from glass, acrylic, and polycarbonate. Lifetime understands Russell's position to be that its polycarbonate backboards are not brittle. Thus, if Russell can convince the Court that one of skill in the art would believe that backboards must be brittle, then Russell can argue that its polycarbonate backboards are not brittle and thereby immune to Lifetime's allegations of infringement. The problem with Russell's construction is that it improperly limits the claims to only the acrylic backboard embodiment of the invention when the asserted patents clearly state that backboards may be constructed from materials other than acrylic.

While the asserted patents describe an approach to building an adhesive bond for a basketball backboard assembly that will help prevent cracking or fracturing of the backboard,[62] the asserted patents do not state that a backboard must be capable of fracturing or cracking in order to be a backboard. Indeed, the word "brittle" is never used in the asserted patents. Most importantly, the asserted patents explicitly state that "basketball backboard[s] can be made of a variety of materials including various polymers and composites."[63] Acrylic backboards were described in the asserted patents as exemplary backboards that were popular due to their resemblance to professional backboards. No statement is made in the asserted patents, or their prosecution histories, that the invention can only work with acrylic or brittle backboards.

Russell may argue that acrylic backboards are the focus of the patent specification and parts of the prosecution history. Even assuming that is true, it is improper to import limitations from the specification or prosecution history into the claims.[64] Moreover, those of skill in the art, *i.e.*, backboard manufacturers, knew that backboards could be made of non-acrylic and non-brittle materials.[65]

**6.    "Elastomeric" should be construed according to the parties' previously-agreed construction.**

| Lifetime's Construction | Russell's Construction |
| --- | --- |
| **Elastomeric**: A material that returns to approximately its original dimensions in a short time after deformation | **Elastomeric**: Having the characteristics of a macromolecular material which, at room temperature, is capable of recovering substantially in size and shape after removal of a deforming force |

---

[62] *See* Ex. 1, '111 patent at cols. 2:65–3:8.

[63] *Id.* at col. 1:19–20.

[64] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) ("[W]e have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment").

[65] Ex. 32, Decl. of David Allen at ¶ 12.

Last May, the parties agreed on Lifetime's construction for "elastomeric" and submitted that agreed construction to the Court in their first Joint Claim Construction and Prehearing Statement.[66] Now apparently there is a dispute because Russell wants to rephrase the construction and needlessly adds words. Russell's proposal unnecessarily adds confusion to a very simple term. The Court should disregard Russell's proposed construction and adopt the plain, ordinary, and previously-agreed construction of the term "elastomeric."

7.    **"Catalyzed [adhesives]" do not necessarily comprise two-parts—"two-part catalyzed adhesives" do.**

| Lifetime's Constructions | Russell's Constructions |
|---|---|
| **Catalyzed [adhesive]**: A catalyzed adhesive is an adhesive having a substance that initiates or increases the rate of the chemical process by which the adhesive thickens or hardens | **Catalyzed [adhesive]**: Having a substance mixed in by the user to control set time |
| **Two-part catalyzed adhesive**: Plain and ordinary meaning | **Two-part catalyzed adhesive**: An adhesive commercially supplied in two parts, one of which is a catalyst, for mixing together to control the cure time |

Construction of the claim terms "catalyzed [adhesive]" and "two-part catalyzed adhesive" present really only one question for the Court: whether one of skill in the art would understand that a catalyzed adhesive would necessarily require an adhesive in which the catalyst was mixed with the adhesive just prior to its use. ██████████████████████████████

████████████████████████████████████████████ █ ████████████

██████████████████████████████████████████████

█████████████████████████████

---

[66] Docket No. 68–1 at p. 2.
[67] Lifetime has not asserted against Russell those patent claims that recite a "two-part catalyzed adhesive." Russell is asking for Court construction of terms not part of the asserted claims.

The standard definition of a catalyst is "a substance that initiates or changes the rate of chemical reaction, but is not consumed or changed by the reaction."[68] Lifetime's proposal incorporates this definition, but Russell does not even attempt to clarify what a catalyst is. Rather Russell's proposal for "catalyst" focuses on inserting a limitation in the claims that is not there by stating that a catalyzed adhesive must be in two-parts.

Although the specification of the asserted patents explains that a two-part arrangement is "typical," it does not state that all catalyzed adhesives are two-part adhesives, and one-part catalyzed adhesives are also available. In many one-part catalyzed adhesives, a "catalyst" is mixed with the adhesive by the adhesive manufacturer, and the curing is triggered *e.g.,* by contact with moisture in the air—a reaction enhanced by the pre-mixed catalyst. Lifetime's adhesives expert also opines that those of skill in the art will understand that a catalyzed adhesive may be one-part or two-part.[69]

The claims themselves indicate that a catalyzed adhesive may be either one-part or multi-part. For example, when Lifetime wanted to limit the claims to a two-part arrangement, it expressly claimed "a two-part catalyzed adhesive."[70] When Lifetime wanted to encompass either one-part or two-part arrangements, it used the term "catalyzed adhesive."[71] The implication is that claims that do not recite "two-part" do not require a "two-part catalyzed adhesive." Russell's proposed definition would extinguish that distinction, rendering the modifier "two-part" completely superfluous, and an interpretation that renders a claim term superfluous is

---

[68] Ex. 27, ASTM Designation D907-00, Standard Terminology of Adhesives, p. 3 (2000).
[69] Ex. 31, Petrie Depo at p. 24.
[70] Ex., '111 patent at claims 7 and 11.
[71] *See*, *e.g.*, *id.* at claim 1.

"presumptively unreasonable"[72] because "[c]laims must be 'interpreted with an eye toward giving effect to all terms in the claim.'"[73] This is unlike the situation with the terms "adhesive" and "non-tape" where the presumption is overcome by, among other things, the clear contrast drawn in the specification between adhesive and double-sided tape. Accordingly, the Court should adopt Lifetime's proposed constructions for "catalyzed [adhesive]" and refrain from construing two-part catalyzed adhesive.

8.   **"Silicone adhesive" and "silicon-based adhesive" claim terms would be understood by those of skill in the art according to their plain and ordinary meanings.**

| Lifetime's Constructions | Russell's Constructions |
| --- | --- |
| **Silicone adhesive**:<br>Plain and ordinary meaning | **Silicone adhesive**: An adhesive for which the base resin is a polymer containing repeat units of alternating silicon and oxygen atoms, as in $(-Si-O-Si-O)_n$ |
| **Silicone-based adhesive**:<br>Plain and ordinary meaning | **Silicone-based adhesive**: An adhesive that has a base resin that is a polymer containing repeat units of alternating silicon and oxygen atoms, as in $(-Si-O-Si-O)_n$ (a "polysiloxane"), a copolymer containing repeat units of alternating silicon and oxygen atoms, as in $(-Si-O-Si-O)_n$ or a blend of a polysiloxane polymer and another polymer |

Again, those of ordinary skill in the art are not chemists.[74] There is no need to turn construction of the claims in the asserted patents into a chemistry lesson because doing so only causes confusion and introduces unnecessary issues into this case. Russell's proposed constructions complicate the claims and are not reflective of the understanding of one of ordinary skill in the art.

---

[72] *Beachcombers Int'l, Inc. v. Wildewood Creative Products, Inc.*, 31 F.3d 1154, 1162 (Fed. Cir. 1994).
[73] *Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249, 1257 (Fed. Cir. 2010).
[74] Ex. 8, White Depo. at pp. 37:19–40:13; Ex. 7, Sims Depo. at pp. 20:7–21:2.

Those of ordinary skill in the art are not concerned with the chemical makeup of silicone adhesives. If an adhesive is described as a silicone adhesive or if the label says silicone, then it is a silicone adhesive to those of skill in the art.[75] Thus, those of skill in the art use the term "silicone adhesive" as a layperson, which under a general definition is defined as "any of various polymeric organic silicon compounds."[76] And evidence shows that those of skill in the art do not differentiate between silicon and silicone as a chemist might.[77]

While the terms "silicone adhesive" and "silicone-based adhesive" are not specifically defined in the asserted patents, they have a simple, plain, and ordinary meaning to those of skill in the art as adhesives labeled or described as silicone. The use of the word "based" simply emphasizes that silicone need not be the only ingredient in the adhesive as adhesives may contain colorants or other fillers that control their viscosity.

Russell's proposed constructions, on the other hand, are directed toward polymer chemists. Russell relies on a technical and chemical definition of "silicone." But, as explained above, persons of ordinary skill in the art of designing basketball systems at the time of the invention did not use the term "silicone" in the same way that chemists do and are not even able to discern a difference between silicon and silicone. Russell's definition also refers to "base resin" without an indication of what this phrase means to those of skill in the art. And Russell's proposed



---

[75] ████████████████████████████████████████████████

[76] Ex. 28, Merriam–Webster's Collegiate Dictionary, p. 1092 (10th ed. 1998). ████████

[77] ███████████████████████████████████████████ *see also* Ex. 17, U.S. Patent No. 6,468,373 (using the terms silicon and silicone interchangeably).

construction of "silicone-based adhesive" refers to "a co-polymer containing repeat units of alternating silicon and oxygen atoms or a blend of a siloxane polymer and another polymer." These technical terms cause confusion, do not add clarity to the claim, cause confusion, and would only be gibberish to those of skill in the art.

Should Russell convince the Court that chemists ordinarily design and manufacture basketball backboards, Lifetime proposed an alternative definition for these terms as they would be understood by a chemist.[78] Specifically, a silicone adhesive as an adhesive that includes components containing alternate silicon and oxygen atoms, and a silicone-based adhesive as an adhesive that includes components with alternate silicon and oxygen atoms and in the highest concentration out of the adhesive's reactants. These constructions come from a chemical definition of adhesive as used in a dictionary at the time of the invention. Even an appropriate chemist's definition of silicone adhesive does not coincide with Russell's proposed construction.

In any event, chemists, or those with chemical training, are not the ordinary designers and manufactures of basketball backboards. The Court should find that those of skill in the art would understand "silicone adhesive" and "silicone-based adhesive" according to their plain and ordinary meanings as adhesives labeled or described as containing silicone.

9.   **"Bond gap"; "bond gap spacers"; and "defined bond gap" claim terms do not imply a pre-calculated distance for a bond gap.**

| Lifetime's Constructions | Russell's Constructions |
|---|---|
| **Bond gap**: The distance between the frame and the backboard when the backboard is adhered to the frame | **Bond gap**: A predetermined distance between the backboard and the frame |

---

[78] Joint Claim Construction and Prehearing Statement, at Ex. B (Docket No. 204-2 at pp. 6–7).

| Lifetime's Constructions | Russell's Constructions |
|---|---|
| **Bond gap spacers**: Structures that maintain the bond gap | **Bond gap spacers**: A rigid structure, other than a filler, having a desired thickness, which maintains a uniform gap between the frame and backboard |
| **Defined bond gap**: Distance between the frame and the backboard as dictated by the bond gap spacer | **Defined bond gap**: A predetermined distance between the backboard and the frame, where the distance is maintained by the thickness of the bond gap spacer |

There are two questions for the Court with respect to these bond-gap terms: (1) whether the existence of a bond gap requires that one of skill in the art pre-calculate its size; and (2) whether one of skill in the art would understand that a bond gap spacer needs to be "rigid."

Starting with the relevant description in the asserted patents, a "bond gap" is described and illustrated as the distance between the frame and the backboard when the backboard is adhered to the frame.[79] Stated another way, it's the thickness of the adhesive that bonds the backboard to the frame. When a frame is adhered to a backboard, a bond gap exists regardless of whether someone pre-calculates its size. Thus, Russell's proposed construction including the term "predetermined" incorrectly implies that a bond gap cannot exist absent its pre-calculation. But as long as there is adhesive in the adhesive joint, there is a bond gap.

A bond gap can be reduced to zero by pressing the adhesive out of the adhesive joint before the adhesive is allowed to set or cure, which would mean that there is no adhesive between the frame and the backboard. Sometimes bond gap spacers are used to maintain the bond gap while the adhesive sets or cures, and to prevent the adhesive from being completely pressed out of the adhesive joint. The specification of the asserted patents states that "[s]uitable spacers can be any rigid structure having the desired thickness which can maintain the gap between the frame and

---

[79] Ex. 1, '111 patent at col. 2:65–67, Figure 1 ("A").

backboard bonding surfaces."[80] Russell's proposed construction in part focuses on the word "rigid," which is fodder for an additional dispute about the magnitude of rigidity required of the bond gap spacer. One of skill in the art would understand that a bond gap spacer could be a structure with sufficient rigidity to maintain the bond gap to prevent adhesive from being pressed out before setting or curing.[81] Thus, the patents describe that bond gap spacers can be both highly-rigid material, such as glass microspheres, or less-rigid material, such as plastic beads or trimmer line.[82] Those of skill in the art at the time of the invention also understood that less-rigid material such as foam squares could be used because they prevented adhesive from being pressed out of an adhesive joint.[83]

Lastly, the term "defined bond gap" is used in connection with the term "bond gap spacers" to state that "one or more bond gap spacers located between the frame bonding surface and the backboard bonding surface [] provide a defined bond gap."[84] In other words, the distance between the frame and the backboard is dictated by the one or more bond gap spacers. Russell's proposed construction again improperly focuses on some predetermination or pre-calculation of the bond gap. No such predetermination is required by the claims. It is enough that the bond gap spacer prevents the adhesive from being pressed out of the adhesive joint such that a bond gap of some size is maintained, and that size is dictated by the nature of the bond gap spacer.

---

[80] *Id.* at col. 3:9–19.
[81] Ex. 31, Petrie at pp. 18–19.
[82] *Id.* at col. 3:14–19.
[83] ███████████████████████████████████████████ *see also* Ex. 29.
[84] *See* Ex. 1, '111 patent at claims 2 and 25.

10.   **"Frame" and "frame structure" are plain and ordinary terms to basketball backboard manufacturers for a structure that supports the backboard.**

| Lifetime's Construction | Russell's Construction |
|---|---|
| **Frame / frame structure**: Plain and ordinary meaning | **Frame / frame structure**: Any structure to which the backboard is attached |

The terms "frame" and "frame structure" are plain and easy to understand on their own. Russell's proposal is far too broad and could include a basketball hoop—which is not a frame.

The specification of the asserted patents describes the frame as a support for the backboard playing surface.[85] ██████████████████████████████ ██████████████ Last May, even Russell had the same understanding and proposed a construction for "frame" as "a rigid support that suspends the backboard."[87] Although, a "frame" or "frame structure" must be sufficiently rigid to support the backboard playing surface, it need not be made of an exceedingly strong material such as steel. Persons of skill in the art knew that frames could be manufactured from plastic or other non-rigid material.[88] Again, the Court should refrain from using the word "rigid" in any construction because it is fodder for further disputes about the magnitude of rigidity required. One of skill in the art would understand that a frame must be sufficiently rigid to support the backboard playing surface during play of basketball.

The Court should refrain from redefining the terms "frame and "frame structure" because their meaning is plain and ordinary. However, if the Court feels compelled to construe the terms, it should reject Russell's construction and state that a frame is a structure that supports the backboard, which is consistent with the plain and ordinary meaning.

---

[85] *Id.* at col. 1:24–25, 1:34–45, Figure 1. ████████████████████████████

[87] Joint Claim Construction and Prehearing Statement at Ex. B (Docket No. 68-2 at p. 3).

[88] ███████████████████████████████████ *see also* Ex. 17, U.S. Patent No. 6,468,373 at Abstract (describing a molded plastic frame bonded to a rebounding surface).

**11.   "Printed image" and "printing an image" claim terms are plain and clear.**

| Lifetime's Constructions | Russell's Constructions |
|---|---|
| **Printed image**:<br>Plain and ordinary meaning | **Printed image**: A pattern applied to a surface using ink or other coating |
| **Printing an image**:<br>Plain and ordinary meaning | **Printing an image**: Applying a pattern to a surface using ink or other coating |

The terms "printed image" and "printing an image" mean what they say, and Russell's proposed constructions re-word these plain terms to make their meaning more cumbersome and vague. In the asserted patents, the specification teaches that an acrylic surface must usually be chemically treated to prepare it for the use of an adhesive, but "[i]t has been found that when the acrylic backboard bonding surface contains a printed image, the printing itself provides an adequate surface preparation."[89] Russell's proposed constructions inexplicably replace the claim term "image" with the word "pattern," and its proposed constructions are not directed toward printing but to any application of a pattern to a surface. There is simply no need to adopt Russell's re-wording of plain and ordinary claim terms, and the Court should decline to do so.

## CONCLUSION

For all of the foregoing reasons, the Court should adopt Lifetime's proposed constructions, and reject Russell's proposed constructions.

Dated: November 21, 2014.

Respectfully submitted,

MASCHOFF BRENNAN

By:   /s/ *Kirk R. Harris*

David R. Wright
Kirk R. Harris
Jared J. Braithwaite

Attorneys for Plaintiff
LIFETIME PRODUCTS, INC.

---

[89] Ex. 1, '111 patent at col. 3:50–60.