Edgar R. Cataxinos
TRASKBRITT, P. C.
230 South 500 East, Suite 300
Salt Lake City, UT 84102
T: 801-532-1922
F: 801-531-9168
ERCataxinos@traskbritt.com

Nathan W. Johnson
Jeffrey D. Dyess
Jacob W. Neu
Thomas Richie
BRADLEY ARANT BOULT CUMMINGS
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2119
T.:205-521-8000
F: 205-521-8800
njohnson@babc.com
jdyess@babc.com
jneu@babc.com
trichie@babc.com

Attorneys for Defendant
Russell Brands, LLC

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| LIFETIME PRODUCTS, INC., a Utah, Corporation<br><br>              Plaintiff,<br><br>     vs.<br><br>RUSSELL BRANDS, LLC, D/B/A SPALDING, a Delaware limited liability Company,<br><br>            Defendants. | **RUSSELL BRANDS, LLC'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**<br><br>Civil Action No. 1:12-cv-00026-DN<br><br>Honorable Judge David Nuffer<br><br>**(FILED UNDER SEAL)** |

**INTRODUCTION**

These proceedings relate to three patents issued to Lifetime Products, Inc, U.S. Patent Nos. 7,749,111 (" '111"), 8,033,935 (" '935") and 8,038,550 (" '550") (collectively, the "Patents"), which share a common specification. The '111 was subject to an *ex parte* reexamination, Reexam. No. 90/012,654 (the "'654 Rex.") The '935 is subject to a pending *inter partes* reexamination, Reexam. No. 95/002,381 (the "'381 Rex."). The '550 is subject to a pending *inter partes* reexamination, Reexam. No. 95/002,377 (the "'377 Rex.") (the three reexamination proceedings, collectively, the "Reexams"). In addition, two other patents relating to the Patents have recently issued, the proceedings of which will be referenced in this Brief: U.S. Patent Nos. 8,852,034 (" '034") and 8,845,463 (" '463"). In the footnotes, the file histories will be referred to according to the patent numbers for ease of reference, rather that the application numbers. All references to the common specification will be given in the format of "(Column:Line)," citing the column and line numbers of the '111 specification. For example "(1:50-2:5)" would refer to the section bounded by column 1, line 40 and column 2, line 4 of the '111 specification.

For the reasons below, the Court should enter Defendant's proposed constructions for the disputed claim terms.

## TABLE OF CONTENTS

INTRODUCTION .......................................................................................... ii

TABLE OF CONTENTS ............................................................................ iii

TABLE OF AUTHORITIES ....................................................................... iv

EXHIBITS ................................................................................................... vi

I. THE LAW OF CLAIM CONSTRUCTION AND INDEFINITENESS ... 1

    a.   General Law of Claim Construction ................................................ 1

    b.   Indefiniteness .................................................................................. 2

II. ORDINARY SKILL IN THE ART INCLUDES KNOWLEDGE OF ADHESIVES ... 4

III. DISPUTED CONSTRUCTIONS ........................................................... 5

A. "acrylic" / "acrylic material" ................................................................ 5

B. "adhesive" / "non-tape adhesive" ........................................................ 6

C. "basketball backboard" ....................................................................... 7

D. "bond gap" / "defined bond gap" ........................................................ 8

E. "bond gap spacer(s) [to provide a bond gap]" .................................... 9

F. "catalyzed" / "catalyzed adhesive" / "two-part catalyzed adhesive" .... 10

G. "elastomeric" ....................................................................................... 13

H. "frame" / "frame structure" ................................................................ 13

I. "printed image" / "printing an image" .................................................. 13

J. "silicone adhesive" / "silicone-based adhesive" ................................. 14

K "sized and configured for playing the game of basketball" ................. 15

L. "adhesive provides [adhesion and flexibility] / [a bond] / flexibility in the bond]" ... 20

M. The Sufficiency Terms ....................................................................... 22

    a.   The Three Sufficiency Terms Must Have Distinct Meanings. ........ 23

    b.   Lifetime Offers Differing Interpretations to the PTO and the Court. ... 25

    c.   VHB and the Torque Test Do Not Resolve the Ambiguity ........... 28

    d.   Lifetime's and Russell's Tests Prove the Subjective Nature of the Terms. ... 31

    e.   "The Game of Basketball Is No More Objective Than "Sufficient." ... 33

## TABLE OF AUTHORITIES

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002)

*Markman v. Westview Insts., Inc.*, 517 U.S. 370 (1996)

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014)

*AbTox, Inc. v. Exitron Corp.*, 131 F.3d 1009 (Fed. Cir. 1997)

*Amazon.com Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343 (Fed. Cir. 2001)

*Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200 (Fed. Cir. 1991)

*Ancora Techs. Inc. v. Apple, Inc.*, 744 F.3d 732 (Fed. Cir. 2014)

*Bowers v. Baystate Techs, Inc.*, 320 F.3d 1317 (Fed. Cir. 2003)

*C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858 (Fed. Cir. 2004)

*Cybor Corp. v. Fas Techs. Inc.*, 138 F.3d 1448 (Fed. Cir. 1998) (en banc)

*Datamize, LLC v. Plumtree Software Inc.*, 417 F.3d 1342 (Fed. Cir. 2005)

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373 (Fed. Cir. 2003)

*Halliburton Energy Servs. v. M-I LLC*, 514 F.3d 1244 (Fed. Cir. 2008)

*In re Vogel*, 422 F.3d 438 (C.C.P.A. 1970)

*Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364 (Fed. Cir. 2014)

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985 (Fed. Cir. 1999)

*Microsoft Corp. v. Multi-Tech Sys. Inc.*, 357 F.3d 1340 (Fed. Cir. 2004)

*N. Am. Vaccine Inc. v. Am. Cynamid Co.*, 7 F.3d 1571 (Fed. Cir. 1993)

*NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282 (Fed. Cir. 2005)

*Norian Corp. v. Stryker Corp.*, 432 F.3d 1356 (Fed. Cir. 2005)

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351 (Fed. Cir. 2008)

*Old Town Canoe Co. v. Confluence Holdings Corp.*, 448 F.3d 1309 (Fed. Cir. 2006)

*Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307 (Fed. Cir. 2007)

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc)

*Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841 (Fed. Cir. 2006)

*Schoenhaus v. Genesco, Inc.*, 440 F.2d 1354 (Fed. Cir. 2006)

*Southwall Techs. v. Cardinal IG Co.*, 54 F.3d 1570 (Fed. Cir. 1995)

*Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271 (Fed. Cir. 2013)

*Tandon Corp. v. U.S. Int'l Trade Comm.*, 831 F.2d 1017 (Fed. Cir. 1987)

*Wenger Mfg., Inc. v. Coating Machinery Sys., Inc.*, 239 F.3d 1225 (Fed. Cir. 2001)

*Afros S.p.a. v. Krauss-Maffei Corp.*, 671 F. Supp. 1402 (D. Del. 1987)

*Flexsys Am. LP v. Kumho Tire U.S.A., Inc.*, 695 F. Supp. 2d 609 (N.D. Ohio 2010)

*Pfizer, Inc. v. Watson Pharmaceuticals, Inc.*, 920 F. Supp. 2d 552 (D. Del. 2013)

*In re Townshend Patent Litigation*, No. C 02-04833 JF, 2004 WL 1920049 (N.D. Cal. Aug. 26, 2004)

*Largan Precision Co. v. Genius Elec. Optical Co., Ltd.*, No. 13-cv-02502-JD, 2014 U.S. Dist. LEXIS 149623 (N.D. Cal. Oct. 20, 2014)

*Sitrick v. Dreamworks, LLC*, Case No. CV 03-4265-SVW, 2006 U.S. Dist. LEXIS 97312 (C.D. Calif. 2006).

Chisum on Patents, § 8.06[A][1]

**TABLE OF EXHIBITS TO RUSSELL'S CLAIM CONSTRUCTION BRIEF**

| EXHIBIT | DOCUMENT |
|---|---|
| 1 | Reexam. No. 95/002,377 ("377 Rex."), Request (Sept. 14, 2012) |
| 2 | Reexam. No. 90/012,654 ("654 Rex."), Final Rejection (Sept. 30, 2013) |
| 3 | 377 Rex., Right of Appeal Notice (Dec. 9, 2013) |
| 4 | Reexam. No. 95/002,381 ("381 Rex."), Right of Appeal Notice (Jan. 16, 2014) |
| 5 | 377 Rex., Russell's Comments in Response to Action Closing Prosecution, Exhibit H (Shigley, Mechanical Engineering Design (6th ed. 2001)) |
| 6 | Dwight Hoffman Declaration |
| 7 | Excerpts from Deposition of Edward Petrie |
| 8 | Excerpts from Deposition of Larry Stevens |
| 9 | Larry Stevens Declaration of February 1, 2013 |
| 10 | Excerpts from Deposition of Edward Van Nimwegen |
| 11 | App. No. 09/228,325 ("111 FH"), Lifetime Response to Office Action (Sept. 17, 2001) |
| 12 | 111 FH, Lifetime Appeal Brief (Jan. 7, 2002) |
| 13 | 111 FH, Lifetime Reply Brief (Apr. 29, 2002) |
| 14 | 381 Rex., Action Closing Prosecution (Apr. 8, 2014) |
| 15 | 381 Rex., Lifetime Response to Office Action (Feb. 8, 2013) |
| 16 | 654 Rex., Examiner Interview Summary (Oct. 30, 2013) |
| 17 | 377 Rex., Lifetime Respondent's Brief (Dec. 1, 2014) |
| 18 | Excerpts from Deposition of David Allen |
| 19 | 111 FH, Transcript of Oral Hearing Before BPAI (Apr. 13, 2010) |
| 20 | General Electric, "Preliminary Product Data Sheet" (1994) (cited as prior art in |

| | |
|---|---|
| | 111 FH) |
| 21 | Dow Corning, "Information About Specialty Materials for High Technology Applications" (1998) (cited as prior art in 111 FH) |
| 22 | 111 FH, BPAI Decision on Appeal (Mar. 27, 2003) |
| 23 | App. 13/270,149 ("'034 Pat. FH"), Request for Continued Examination (Apr. 21, 2014) |
| 24 | Maureen Reitman Declaration |
| 25 | Excerpts from Deposition of Lance Bosgeiter |
| 26 | *Handbook of Adhesives* (Skeist, Irving, ed. 1990) |
| 27 | 111 FH, Lifetime Office Action Response (Mar. 12, 2001) |
| 28 | 654 Rex., Lifetime Appeal Brief (Feb. 28, 2014) |
| 29 | U.S. Pat. No. 8,845,463 |
| 30 | 381 Rex., Lifetime Respondent's Brief (Dec. 1, 2014) |
| 31 | 111 FH, Lifetime's Amended Appeal Brief (Feb. 28, 2008) |
| 32 | Jerry Ward Declaration |
| 33 | 111 FH, BPAI Decision on Appeal (Apr. 27, 2010) |
| 34 | Cliff Holstein Declaration |
| 35 | Larry Stevens Supplemental Declaration of July 26, 2013 |
| 36 | 377 Rex., Lifetime Response to Office Action (Feb. 8, 2013) |
| 37 | 377 Rex., Russell's Comments in Response to Action Closing Prosecution (June 4, 2014), Ex. H (ASTM F 1882-98, § 6 (1998)) |
| 38 | 377 Rex., Russell's Comments in Response to Action Closing Prosecution (June 4, 2014), Ex. K (1999 Manual) |
| 38 | 381 Rex., Lifetime Response to Action Closing Prosecution (May 7, 2014) |
| 39 | 111 FH, Office Action Response (Nov. 17, 2001) |

| 40 | Declaration of Jacob W. Neu |
| App. A | Highlighted Copy of *Halliburton Energy Servs. v. M-I LLC*, 514 F.3d 1244 (Fed. Cir. 2008) |
| App. B | Courtesy Copies of Cited Unpublished Case Law |

# I.      THE LAW OF CLAIM CONSTRUCTION AND INDEFINITENESS

A patent "is a property right; and like any property right, its boundaries should be clear."[1] Claims must set fences around inventions so a person of ordinary skill in the art (an "Artisan") can understand the invention and design a non-infringing product.[2]

## a.   General Law of Claim Construction

Three issues are particularly relevant to the claim construction dispute. ***First***, while claim terms are "generally given their ordinary and customary meaning," even if the words of the term itself make sense, a dispute may remain as to the *scope* of such meaning, in which case "reliance on a term's 'ordinary' meaning does not resolve the parties' dispute."[3] In such circumstances, the Court *must* construe the term: submitting the question of the "plain and ordinary meaning" to the jury improperly puts a legal question—the scope of a claim term—in the jury's hands.[4]

***Second***, a patentee's remarks in gaining allowance matter, as do the PTO's responses. It is improper to use extrinsic evidence in a way that may "contradict any definition found in or ascertained by a reading of the patent documents."[5] It is also improper to ignore the concessions a patentee made in obtaining the patent. Nevertheless, Lifetime relies heavily on expert testimony and engineer depositions in its argument, to the virtual exclusion of the intrinsic evidence (the specification and prosecution histories of the Patents and related patents)[6]. The intrinsic evidence

---

[1] *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 731 (2002).

[2] "A patent holder should know what he owns, and the public should know what he does not. For this reasons, the patent laws require inventors to describe their work in 'full, clear, concise, and exact terms,' 35 U.S.C. § 112...." *Id.*

[3] *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).

[4] *Id.* at 1362; *Markman v. Westview Insts., Inc.*, 517 U.S. 370 (1996).

[5] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1322-23 (Fed. Cir. 2005) (internal quotations omitted).

[6] Proceedings of related but unasserted patents, and post-issuance proceedings such as reexaminations, are part of the "prosecution history" and take precedence over extrinsic evidence. *Bow-*

tells a very different story from the constructions Lifetime proposes based on such testimony. Lifetime cites file history with respect to only 2 sets of terms, and in ways that distort the actual import of the record. In effect, Lifetime runs from its arguments at the PTO, but it may not seek constructions "divorced from the context of the written description and prosecution history."[7]

**Third**, Lifetime overstates the proscription against limiting claims by reference to the specification. "The construction that stays true to the claim language *and most naturally aligns with the patent's description of the invention* will be, in the end, the correct construction."[8] When the intrinsic evidence describes "the present invention," such statements do limit claim scope.[9]

### b. Indefiniteness

Several of the Patents' terms are indefinite because, they do not "inform [the Artisan] about the scope of the invention with reasonable certainty" in view of the specification and file history.[10] To adjudicate indefiniteness, the Federal Circuit provides several guiding principles. **First**, the Court *must* consider the prosecution history when construing the claims.[11] Inconsistent positions taken by the patentee impair or prevent reasonably certain construction.[12] This is exactly the case here, where Lifetime's position differs within the file history, and between the PTO and this Court.

---

*ers v. Baystate Techs, Inc.*, 320 F.3d 1317, 1333 (Fed. Cir. 2003) (reexams); *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005) (related patents).

[7] *Old Town Canoe Co. v. Confluence Holdings Corp.*, 448 F.3d 1309, 1318 (Fed. Cir. 2006).

[8] *Phillips*, 415 F.3d at 1316 (internal citation omitted).

[9] *See Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1314-1315 (Fed. Cir. 2007) (references to "present invention" in the specification and the file history deemed to be limiting of scope).

[10] *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014).

[11] *Ancora Techs. Inc. v. Apple, Inc.*, 744 F.3d 732, 738 (Fed. Cir. 2014).

[12] *See Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1372-73 (Fed. Cir. 2014).

**Second**, claim construction focuses on the claims to determine the boundaries of what is within, and what is outside of, the scope of the patent monopoly. "A patent must be precise enough to afford *clear notice of what is claimed*, thereby 'appris[ing] the public of what is still open to them.'"[13] It is not enough that one could identify an embodiment that may be clearly within the scope;[14] the claim "must *clearly circumscribe what is foreclosed* from future enterprise."[15] "Otherwise, competitors cannot avoid infringement, defeating the public notice function of patent claims."[16] Terms of degree (such as "sufficient") "*must provide objective boundaries* for those of skill in the art."[17] Moreover, a claim is indefinite if an Artisan "cannot translate the definition into meaningfully precise claim scope," even if a patentee "can articulate a definition supported by the specification."[18] Where "an artisan [must] make a separate infringement determination for every set of circumstances [that] are likely to result in different outcomes (sometimes infringing and sometimes not), that construction is likely to be indefinite."[19]

**Third**, claim scope must be *reasonably certain*. In *Nautilus*, the Supreme Court altered the definiteness standard, emphasizing the importance of "reasonable certainty" in claim terms.[20] Courts applying *Nautilus* have rejected Lifetime's argument that the *Nautilus* standard "may have accorded with" the old "insolubly ambiguous" standard. (Dkt. 211, at 8 n.34.) The Federal Circuit emphasized the change: "it is not enough as some of the language in our prior cases may

---

[13] *Nautilus*, 134 S. Ct. at 2129 (emphasis added) (quoting *Markman*, 517 U.S. at 373).

[14] *See, e.g.*, *Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1218 (Fed. Cir. 1991).

[15] *Nautilus*, 134 S. Ct. at 2129 n.6 (emphasis added, internal quotation omitted).

[16] *Halliburton Energy Servs. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008).

[17] *Interval Licensing*, 766 F.3d at 1370-71 (emphasis added).

[18] *Halliburton*, 514 F.3d at 1251.

[19] *Id.* at 1254-55.

[20] *Nautilus*, 134 S. Ct. at 2119.

have suggested, to identify 'some standard for measuring the scope of the phrase.'"[21] In sum, "There is no question that *Nautilus* lowers the bar for showing indefiniteness...."[22]

Finally, Lifetime misstates procedure by alleging that Russell's indefiniteness arguments are "wholly inconsistent" with the obviousness arguments made in the Reexams. (Dkt. 211, at 7.) As the Federal Circuit notes, "[n]either the examiner nor the Board could address claim indefiniteness" in reexaminations.[23] Thus, Lifetime is complaining that Russell did not raise issues that Russell could not raise in the Reexams. *Interval Licensing*, which Lifetime cites, is a case where the Federal Circuit held terms to be indefinite *after* an inter partes reexamination.[24] Lifetime's assertion that indefiniteness is some late-minted "defense *du jour*" (Dkt. 211, at 8) is specious; Russell challenged definiteness long ago, and *Nautilus* is the law. As *Nautilus* succinctly states, definiteness "mandates clarity;"[25] the terms identified as indefinite in this case are far from clear.

## II.   ORDINARY SKILL IN THE ART INCLUDES KNOWLEDGE OF ADHESIVES

The PTO has already decided the level of ordinary skill in the art includes persons having knowledge of both basketball *and* adhesives.[26] The PTO specifically found that "a person of ordinary skill in the basketball manufacturing design … would work with a chemist, material scientist or process engineer …."[27] Even Lifetime's proposed engineer Artisans would know adhesive selection principles: the PTO cited a mechanical engineering design textbook containing 30

---

[21] *Interval Licensing*, 766 F.3d at 1370 (citing and recognizing abrogation of prior cases).
[22] *Largan Precision Co. v. Genius Elec. Optical Co., Ltd.*, No. 13-cv-02502-JD, 2014 U.S. Dist. LEXIS 149623, at *16 (N.D. Cal. Oct. 20, 2014).
[23] *Interval Licensing*, 766 F.3d at 1373 n.7.
[24] *Id.* at 1372-73.
[25] *Nautilus*, 134 S. Ct. at 2129.
[26] Ex. 2, 654 Rex., Final Rejection, at 11 (Sept. 30, 2013); Ex. 3, 377 Rex., Right of Appeal Notice, at 24 (Dec. 9, 2013); Ex. 4, 381 Rex., Right of Appeal Notice, at 18-19 (Jan. 16, 2014).
[27] Ex. 3, 377 Rex., Right of Appeal Notice, at 24 (Dec. 9, 2013).

pages about adhesive joint design and recommending working with "chemists, material scientists, or process engineers" to select adhesives for particular applications.[28] Lifetime's Reexam expert called "adhesive technology" the "relevant art," and Lifetime's litigation expert Dr. Petrie agrees that product designers such as those in sporting goods would typically approach a consultant such as himself to assist in optimizing adhesive performance.[29] Finally, the inventor himself testified that he spoke with an adhesives vendor, Rick Bradford, who suggested one of the named adhesives in the specification.[30] Once the Court, like the examiner, strips away Lifetime's self-serving employee declarations, the objective evidence supports the examiner's determination that "the definition of ordinary skill … would be an interdisciplinary team with knowledge of basketball and adhesives."[31] An Artisan may properly be the combination of disciplines or a team of people in mixed disciplines.[32]

## III.   DISPUTED CONSTRUCTIONS

### A.   "acrylic" / "acrylic material"

| P: Plain and ordinary meaning | D: Acrylic - Any acrylate-based plastic, whether or not containing a toughener or other modifier; Acrylic Material - Any material made from any acrylate-based plastic, whether or not containing a toughener or other modifier |
|---|---|

The parties agree that acrylic is an "acrylate-based plastic," (Dkt. 211, at 15), with the dispute being only what else to include in the definition. Evidence will be presented in the case showing pre-application testing by the inventor and Lifetime of acrylics both with and without

---

[28] *Id.* at 23-24; *see also* Ex. 5, 377 Rex., Response to ACP (Oct. 25, 2013), Ex. H (Shigley, Mechanical Engineering Design, at 575, 576 (6th ed. 2001)).

[29] Ex. 6, Hoffman Decl., ¶ 17; Ex. 7, Petrie Depo., 162:5-18.

[30] Ex. 8, Stevens Depo., 158:22-161:14; 260:25-262:4.

[31] Ex. 3, 377 Rex., Right of Appeal Notice, at 24 (Dec. 9, 2013).

[32] *See, e.g.*, *Pfizer, Inc. v. Watson Pharmaceuticals, Inc.*, 920 F. Supp. 2d 552, 558 (D. Del. 2013); *Afros S.p.a. v. Krauss-Maffei Corp.*, 671 F. Supp. 1402, 1418 (D. Del. 1987).

modifiers.[33] Further, evidence will be presented that acrylics behave differently (and in ways material to the claimed invention) based upon the presence of a toughener/modifier.[34] Thus, a question about scope of these terms exists that should not, and cannot, be left for the jury's determination with Lifetime's proposed construction of "plain and ordinary."[35] Rather, the Court should decide now, so that it can instruct the jury later, that modified acrylics are "acrylics."

B.   **"adhesive"/"non-tape [adhesive]"**

| **P:** Adhesive: A substance that holds materials together by surface attachment, which does not include double-sided tape; Non-tape [adhesive]: A substance that hold materials together by surface attachment, which does not include double-sided tape | **D:** Adhesive: Material, such as tape, epoxy, resin, and glue, that binds other materials together by surface attachment; Non-tape [adhesive]:Any form of adhesive other than tape, including without limitation multiple part solvent liquid or paste, one part solvent liquid or paste, one part liquid solution, powder, film, hot melt, mastic, or spray |
|---|---|

Double-sided tape *is* an adhesive, as Lifetime's adhesives expert would agree in the general case.[36] Lifetime asks the Court to re-define adhesive to expressly exclude double-sided tape from its meaning, based upon the suggestion that the specification "clearly" excludes double-sided tape from the definition of adhesive. However, the specification itself uses the term "adhesive tape" (1:41), scuttling the argument about "clear" exclusion. In fact, the intrinsic evidence shows Lifetime itself frequently using the term "adhesive" to refer to double-sided tape.[37]

---

[33] Ex. 9, Stevens Decl. App. A (Test Orders 1870, 1919, 1967, 2027, and 2053); Ex. 8, Stevens Depo., 78:23–79:19 (discussing Lifetime's use and testing of modified acrylics).

[34] For example, modified acrylic may better withstand impacts without cracking, meaning that there is less work for the adhesive to do.  Ex. 10, Van Nimwegen Depo. 71:24-72:22.

[35] *O2 Micro*, 521 F.3d at 1361-62.

[36] Ex. 7, Petrie Depo., 34:6-35:19.

[37] Ex. 11, 111 FH, Office Action Resp., at 3, 5 (Sept. 17, 2001) (referring to tape and elastomeric adhesive as "different adhesive[s]"); Ex. 12, 111 FH, Appeal Brief, at 5, 7, 9 (Jan. 7, 2002) (referring to "alternative adhesive[s]" to tape); Ex. 13, 111 FH, Reply Brief, at 2 (Apr. 29, 2002) ("Hying discloses one and only one adhesive, double sided tape.").

In any case, the file history forecloses Lifetime's construction. Lifetime added the "non-tape" limitation to "adhesive" specifically to overcome rejection.[38] Prior to this amendment, the PTO continued rejecting claims on the specific finding that that "adhesive" includes tape.[39] The *narrowing* of "adhesive" to "non-tape adhesive" was the direct cause of allowance. Having obtained allowance by narrowing the recited term, Lifetime cannot claim "adhesive" and "non-tape adhesive" mean the same thing.[40] If Lifetime believed the examiner was incorrect, its proper relief was appeal to the Board, not argument against it *post hoc* in litigation.[41] Including "non-tape" in the word "adhesive" also would impermissibly render the term "non-tape" in the claims superfluous.[42] "Adhesive" must include tape; only "non-tape adhesive" can exclude it.

### C.   "basketball backboard"

| **P:** Plain and ordinary meaning | **D:** A brittle surface behind a basketball hoop |
|---|---|

At the PTO, Lifetime emphasizes dozens of times that the backboards of its invention are brittle. *See* Dkt. 204-4, at 30-43 (collecting over 50 uses of "brittle" in the file history). Indeed, the brittleness of the backboard formed a central problem Lifetime claims to have solved: "The results of the invention were unexpected in view of the prior art which taught there had to be a gap or space between the *brittle backboard* and the rigid frame, and the *brittle backboard* could not be directly attached to the rigid frame so that the backboard would not crack or break."[43] The

---

[38] Lifetime admits as much: "The proposed amendments to Claims 1, 17 and 24 change the wording 'an adhesive' to 'a non-tape adhesive' and this overcomes the sole remaining rejection set forth in the ACP." Ex. 39, 381 Rex., Response to ACP, at 8 (May 7, 2014).

[39] Ex. 14, 381 Rex., ACP, at 5-7 (Apr. 8, 2014).

[40] *Norian Corp. v. Stryker Corp.*, 432 F.3d 1356, 1360 (Fed. Cir. 2005).

[41] *Schoenhaus v. Genesco, Inc.*, 440 F.2d 1354, 1359 (Fed. Cir. 2006).

[42] *Tandon Corp. v. U.S. Int'l Trade Comm.*, 831 F.2d 1017, 1023 (Fed. Cir. 1987).

[43] Ex. 15, 381 Rex., Office Action Resp., at 33 (Feb. 8, 2013) (emphasis added).

examiner acknowledged Lifetime's arguments relating to the "brittle" backboard.[44] Lifetime even

filed an appellate brief with the PTO a *week* after its claim construction brief in this case that de-

scribes the '550 as directed to "bonding a *brittle structure*, such as an acrylic backboard, to a rig-

id frame."[45] Lifetime's reliance on backboards as "brittle" is so pervasive that the Artisan would

conclude that brittleness is a defining characteristic of backboards of the invention.[46] Holding

otherwise would improperly[47] allow Lifetime to construe "backboard" one way to obtain allow-

ance and another way against Russell now.[48]

### D.   "bond gap" / "defined bond gap"

| **P:** Bond gap: The distance between the frame and the backboard when the back-board is adhered to the frame. Defined bond gap: Distance between the frame and the backboard as dictated by the bond gap spacer | **D:** Bond gap: A predetermined distance between the backboard and the frame. Defined bond gap: A predetermined distance between the back-board and the frame, where the distance is main-tained by the thickness of the bond gap spacer |
|---|---|

The parties' dispute hinges on the word "predetermined," which the specification requires

and only Russell's construction includes. After discussing methods of manufacture, the specifi-

cation makes it clear that a *predetermined* gap is a necessity in all embodiments: "*In either case,

a predetermined* bond gap is maintained …. the bond gap *is important* to achieve a suitable bal-

ance between adhesion and flexibility." (4:5-13). The specification explains the criticality of the

bond gap size (2:65-3:14) and the "need to control" that gap size (2:11-13). Lifetime repeatedly

told the Board that the bond gap size was "critical," "very critical," and "very important," indi-

---

[44] Ex. 16, 654 Rex., Examiner Interview Summary, at 2 (Oct. 30, 2013).

[45] Ex. 17, 377 Rex., Respondent Brief, at 19 (Dec. 1, 2014) (emphasis added).

[46] *See Sunovion Pharms., Inc. v. Teva Pharms. USA, Inc.*, 731 F.3d 1271, 1277 (Fed. Cir. 2013) (repeated use of a term together with a characteristic imports the characteristic into the term).

[47] "Claims may not be construed one way [for] allowance and in a different way against accused infringers." *Southwall Techs. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).

[48] Allen's declaration suggests that an Artisan understands that backboards can be made of non-brittle materials, but this assertion should be discounted because Allen testified in deposition that he had not read the file histories of any of the Patents. Ex. 18, Allen Depo., 10:22-13:17.

cating that a specific and uniform size was necessary.[49] Both parties' constructions for "defined bond gap" acknowledge that a "defined" gap is one influenced by the bond gap spacer, the difference being that Russell's construction (1) uses the language of the specification, "maintain" (3:11-14; 4:5-7); and (2) ties that concept to the "thickness" of the spacer as the specification does (3:12).

### E.     "bond gap spacer(s) [to provide a bond gap]"

| P: Structure that maintains the bond gap | D: A rigid structure, other than a filler, having a desired thickness which maintains a uniform gap between the frame and backboard |
|---|---|

Russell's construction is straight from the specification: "Suitable [bond gap] spacers can be any rigid structure having the desired thickness which can maintain the gap between the frame and backboard bonding surfaces." (3:11-14). The file history stresses rigidity is not optional: "The bond gap spacer *should have a rigid structure* of the desired thickness."[50] The reason is clear:  the bond gap spacers are there to "maintain" the bond gap, which Lifetime argued is "**very critical.**"[51] If a structure is not rigid, it is not suitable as a bond gap spacer for this alleged invention. As to "fillers," Lifetime clearly disclaimed these as not being bond gap spacers.[52]

Lifetime's proposed construction is overbroad because it omits the "rigid" requirement altogether and encompasses expressly disclaimed structures, such as foam and fillers. Lifetime does not dispute that "rigid" is a necessary bond gap spacer attribute, but instead argues that the word is too vague (Dkt. 211, at 23), as if this were a reason to leave a critical concept out of a construction altogether.  Yet, "rigid" is the term Lifetime thought clear enough to describe the

---

[49] Ex. 19, 111 FH, BPAI Oral Hearing, at 5:8-14, 7:2-3, 7:5-9,and 9:21-23.
[50] Ex. 12, 111 FH, Appeal Brief, at 5 (Jan. 7, 2002) (emphasis added).
[51] Ex. 19, 111 FH, BPAI Oral Hearing, at 5:8-14.
[52] Ex. 40, 111 FH, Office Action Resp., at 11 (Nov. 17, 2000) ("But a 'filler' is not a 'bond gap' or 'bond gap spacer.'").

spacers in the specification (3:12), and to use 27 times in one hearing alone to describe frames and distinguish flexible material, confirming its clear meaning.[53] Lifetime's argument that "*less rigid* materials such as foam squares" ([Dkt. 211](), at 23) are nonetheless "rigid" is an illogical semantic feat that only a patent lawyer would try.  It also ignores clear disclaimers in the intrinsic evidence: e.g., "Bond gap spacers of claims 7-10, 14, and 16-18 are not taught or suggested by the cited prior art," which included Hying and its foam core tape.[54]  Lifetime's reading—or reading out—of "rigid" also contradicts the stated purpose of bond gap spacers, which is to "provide" and "maintain" the gap." (Abstract, and 3:11-14). The file history shows that because of this purpose to "control" the bond gap, the "type and structure of the bond spacers used is important"[55] which "rigid" structures like those in the specification ("spherical beads," "glass microspheres," "weed trimmer line and plastic beads") (3:15-20) can do, but "less rigid" structures would not.

### F.    "catalyzed" / "catalyzed adhesive" / "two-part catalyzed adhesive"

| P: catalyzed [adhesive]: A catalyzed adhesive is an adhesive having a substance that initiates or increases the rate of the chemical process by which the adhesive thickens or hardens.<br>Two-part catalyzed adhesive: plain and ordinary meaning | D: catalyzed [adhesive]: Having a substance mixed in by the user to control set time.<br>Two-part catalyzed adhesive: An adhesive commercially supplied in two parts, one of which is a catalyst, for mixing together to control the cure time |
|---|---|

Lifetime's proposed construction for "catalyzed adhesive" relies solely on extrinsic evidence and ignores its own statements to the examiner and to the Board. Lifetime avoids the file

---

[53] *E.g.*, [Ex. 19](), 111 FH, BPAI Oral Hearing, 2:18-3:1, 11:6-11.

[54] [Ex. 27](), 111 FH, Office Action Resp., at 7 (Mar. 12, 2001). *See also* [Ex. 36](), 377 Rex., Office Response, at 16 (Feb. 8, 2013) ("The cited [prior art] discloses VHB double-sided tape with a foam center to attach the acrylic backboard to the frame. There is no teaching, suggestion or disclosure regarding the size of the bond gap or if the VHB double-sided tape includes any bond gap spacers.""); [Ex. 15](), 381 Rex. Office Action Resp., at 18 (Feb. 8, 2013) ("There was no teaching, suggestion, motivation or other reason to dispose bond gap spacers between the backboard and the frame in connection with the VHB double-sided tape.").

[55] [Ex. 40](), 111 FH, Office Action Resp., at 6 (Nov. 17, 2000).

history because it seeks to improperly expand the scope of "catalyzed" beyond what the inventor actually invented and what it specifically told the PTO when trying to obtain these patents.

*First*, the specification refers to catalyzed adhesives as two-part, stating a typical catalyzed silicone adhesive "contains two parts: (1) the adhesive itself and (2) a separate catalyst which is mixed with the adhesive to initiate curing," (3:26-28), the clear import being the catalyst is a separate component mixed in to initiate the curing, not at some prior time. The only examples the patentee gave of "suitable" adhesives are both adhesives in which a user mixes a base part with a second part to initiate the curing.[56] The specification contrasts a catalyzed silicone adhesive with the "conventional single-stage silicone adhesive"—a one-part adhesive—having a "long cure time" and making manufacturing difficult. (3:20-24). The specification also consistently links the catalyzed adhesive to the Artisan's ability to "control" or "tailor" the set time, (Abstract; 2:66-67; 4:20-22), and thus lets the Artisan vary the set time at the time of use.

*Second*, the file history confirms the definition in the specification. Before the Board in the 2010 oral hearing, Lifetime's attorney—unprompted by panel questioning—voluntarily defines the invention as the ability to mix in a catalyst and adhesive to control the cure time, stating "you use a catalyst and the adhesive and you mix them together [to] control the cure time. *That's part of the invention*."[57] "Statements that describe the invention as a whole, rather than statements that describe only preferred embodiments, are more likely to support a limiting definition of a claim term."[58] This statement confirms the specification's definition of "catalyzed." It also adopts the Board's 2003 characterization of using "catalyzed" adhesive to "customize" the set

---

[56] Ex. 20, "Preliminary Product Data Sheet" (1994) (D1-SEA 210); Ex. 21, "Information About Specialty Materials for High Technology Applications" (1998) (Q3-6093).

[57] Ex. 19, 111 FH, BPAI Oral Hearing, 5:1-8 (emphasis added).

[58] *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 864 (Fed. Cir. 2004).

time.[59] And in related patents, Lifetime characterized a catalyst as something "added to the adhesive" to "modify" the set time.[60] Lifetime's consistent use of "catalyzed" is to control, tailor, or modify the adhesive set time at the time of curing, specifically by "mixing in" the catalyst.

Nevertheless, Lifetime would incongruously have this Court believe the Artisan knows nothing about adhesives, (Dkt. 211, at 2), yet can read adhesive data sheets and find catalyzed adhesives by looking at the cure time.[61] Much more plausibly, an Artisan reading the intrinsic evidence would take Lifetime at its word—a catalyzed adhesive is one where a separate catalyst is "mixed with the adhesive to initiate curing," because "that's part of the invention."

Lifetime incorrectly argues that Russell's claim constructions violate the canon of claim differentiation. First, Russell presents a separate definition of two-part catalyzed, based on Lifetime's assertion that "typically" the catalyzed adhesive is sold as two parts. Russell respects claim differentiation; one could purchase the catalyst separately from the base adhesive. Second, even if this would collapse the construction of the two terms, claim differentiation is a "rebuttable presumption" that may be overcome by reading the claim in light of the intrinsic evidence. The presumption of claim differentiation is particularly strong where reading one limitation into another would vitiate "the only meaningful difference between the two claims."[62] However, the limitation to "two parts"—unlike the "non-tape" limitation—is not the only meaningful difference in the dependent claims. Claims 7 and 11 of the '111 include an additional limitation as to the specific set times dictated by the ratio in which the two parts are combined. The principle of

---

[59] Ex. 22, 111 FH, BPAI Decision on Appeal, at 2 (Mar. 27, 2003).
[60] Ex. 23, '034 Pat. FH, Request for Continued Exam., at 28 (Apr. 21, 2014).
[61] Ex. 7, Petrie Depo., 87:19-88:8.
[62] *Wenger Mfg.*, 239 F.3d at 1233.

antecedent basis demands that "the" two parts be previously introduced.[63] The phrase "a two-part catalyzed adhesive" is therefore necessary in these claims. Moreover, regardless of the presumption of claim differentiation, "[it] does not allow unrestrained expansion of claims beyond the description of the invention in the specification, and explanations and representations made to the PTO in order to obtain allowance of the claims."[64] The inventor chose to define a catalyzed adhesive as having two parts, and Lifetime freely and voluntarily described mixing in the catalyst with the adhesive to control the set time as "part of the invention." Therefore, Lifetime's own statements and representations rebut the presumption.

### G.   "elastomeric"

Russell will agree to Lifetime's proposed definition of "elastomeric."

### H.   "frame" / "frame structure"

| P: Plain and ordinary meaning | D: Any structure to which the backboard is attached |
|---|---|

Russell is willing to accept Lifetime's proposal (first offered in its brief) that "frame" and "frame structure" mean "a structure that supports the backboard." (Dkt. 211, at 24). Russell agrees with Lifetime that these terms must be understood broadly to encompass any structure that supports the backboard, and that a frame need not be made of any particular material.

### I.   "printed image" / "printing an image"

| P: Plain and ordinary meaning | D: Printed image: pattern applied to a surface using ink or other coating; Printing an image: Applying a pattern to a surface using ink or other coating |
|---|---|

These terms need construction because the parties cannot agree on their plain and ordinary meanings. Lifetime seems to acknowledge a difference between "image" and "pattern," but

---

[63] Chisum on Patents, § 8.06[A][1] ("A general guide for clear writing is to provide an "antecedent basis" for terms and concepts. Complying with the guide usually entails using an indefinite article (e.g., "*a* general guide") on the first occurrence of a term and using a definite article (e.g., "*the* guide") on subsequent occurrences.").

[64] *Tandon Corp.*, 831 F.2d at 1028.

does not say what that difference is or why it matters. (Dkt. 211, at 25). By "pattern," Russell means only to convey that the "image" in the claim term is a broad concept not limited to a like-ness of something visual. Printing *can* involve ink, (4:27-32), but other references in the specifi-cation say nothing about ink or show that any particular ink or coating is necessary, (5:56-60).

**J.**    **"silicone adhesive" / "silicone-based adhesive"**

| **P:** Plain and ordinary | **D:** silicone adhesive – an adhesive for which the base resin is a polymer con-taining repeating units of alternating silicon and oxygen atoms, as in (-Si-O-Si-O)$_n$; Silicone-based adhesive – an adhesive that has a base resin that is a polymer containing repeating units of alternating silicon and oxygen atoms, as in (-Si-O-Si-O)$_n$ (a "polysiloxane"), a copolymer containing repeat units of alternating silicon and oxygen atoms, as in (-Si-O-Si-O)$_n$, or a blend of a polysiloxane polymer and another polymer |
|---|---|

Russell's proposed constructions are based on the clear teaching of the specification, con-firmed by the extrinsic evidence, that a silicone is a polysiloxane.[65] The specification identifies two brands of adhesives as "[s]uitable silicone adhesive," but clarifies that "[t]he commercially available silicone adhesive includes dimethylpolysiloxane as a primary ingredient…." (2:59-62). Thus, in 1999 the inventor expected an Artisan not only to know what dimethylpolysiloxane was, but also to understand that a silicone adhesive includes it. Both parties' extrinsic evidence con-firms this understanding: a 1990 adhesives handbook describes "silicone adhesives" as polysiloxanes,[66] and both Lifetime's and Russell's experts agree that a silicone adhesive is one formed of polysiloxane.[67] Likewise, Russell's proposed construction of "silicone-based adhe-sive" accounts for the difference between the two terms, defining it as one in which a silicone polymer is combined with other polymers to form a "silicone-based" adhesive.

---

[65] "Polysiloxane" are repeating, alternating silicon and oxygen atoms.  Ex. 24, Reitman Decl., ¶26.
[66] Ex. 26, *Handbook of Adhesives* 629-33 (Skeist, Irving, ed. 1990).
[67] Ex. 7, Petrie Depo. 46:24-47:8; Ex. 24, Reitman Decl. ¶ 26.

While formally proposing "plain and ordinary meaning," Lifetime argues for collapsing the terms into one definition: "adhesives labeled or described as silicone." (Dkt. 211, at 20.) Adding to the uncertainty, Lifetime asserts that an Artisan would blindly accept what an unidentified person or entity would call a silicone adhesive. *Id.* Lifetime's definition depends on how a third person, such as a retailer, salesman, or manufacturer chooses to subjectively describe or label adhesives; a non-infringing adhesive having an undisclosed composition one day becomes an infringing adhesive the next when someone puts it on the shelf with the silicone adhesives.

Claim differentiation presumes that "silicone" and "silicone-based" must carry different meanings.[68] Russell proposes constructions that address this consideration, while adopting "plain and ordinary" for both terms would improperly leave the distinction in the hands of the jury.[69]

**K.      "sized and configured for playing the game of basketball"**

| **P:** Plain and ordinary meaning | **D:** Indefinite |
|---|---|

Even if the parties agreed that all of Russell's products fall within the bounds of what this limitation might mean, that would not resolve the definiteness inquiry. Though a limitation may have a core of meaning that is not in dispute, the claim remains invalid if the boundary of that term is unclear. Claim construction principles—not the accused products—govern construction and invalidity.[70] Lifetime's argument ignores this law.

Lifetime argues as if Russell's position is that the *words* of this limitation are not understandable. To the contrary, while the *words* themselves may be intelligible, Russell contends that the ***scope*** of the phrase is indefinite. An actual dispute exists as to the scope as "reliance on a

---

[68] *Tandon Corp.*, 831 F.2d at 1023.
[69] *O2 Micro*, 521 F.3d at 1361-62.
[70] *Cybor Corp. v. Fas Techs. Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc).

term's 'ordinary' meaning does not resolve the parties' dispute."[71] Lifetime's argument boils down to this: the Artisan knows what this language means, because even Russell knows. Yet, Lifetime carefully avoids discussing the contours of that meaning or its scope. The jury will ultimately be asked to apply this limitation to Russell's products. Because claim construction is a matter of law, the task for the Court is to ensure that the jury is informed what the Artisan allegedly thinks, if that can be done in "reasonably certain" terms.[72]

The specification, file history, and extrinsic evidence all prove that the actual boundaries of this term are undefined. First, this limitation was specifically inserted to overcome a rejection over prior art,[73] and therefore must be treated as limiting.[74] However, the **scope** of the limitation lacks any **objective boundaries** that an Artisan (or a jury) can apply when assessing infringement or obviousness. The prior art in question, Nunes, is a desk lamp having a "miniature basketball backboard" that a person may shoot objects at for amusement.[75] Thus it is clear that miniature novelty desk lamp backboards, even if operational, are excluded from the claims. What is not clear is how much larger than the specific Nunes reference a backboard must be before it is "sized and configured for playing the game of basketball." Lifetime's differing positions before the PTO and this Court evidence the lack of certainty. At the PTO, Lifetime refers to "regulation sizes" of 72, 60, 54, and 48 inches as explaining that "sized and configured…" excludes the miniature Nunes size.[76] At the same time, Lifetime has accused Russell's 42 and 44 inch boards of infringing, indicating that "sized and configured" is not limited to that 48-inch and larger size

---

[71] *O2 Micro*, 521 F.3d at 1361.
[72] *Id.* at 1360.
[73] Ex. 27, 111 FH, Office Action Resp., at 2-3 (Mar. 12, 2001).
[74] *Norian Corp.*, 432 F.3d at 1360 (using narrowing amendments in construing terms).
[75] Dkt. 212-15 (U.S. Pat. 5,677,896), 3:9-14, 7:1-8.
[76] Ex. 28, 654 Rex., Appeal Brief, at 29 (Feb. 28, 2014).

that it articulates at the PTO. The fact that Lifetime takes these varied (and contradictory positions) demonstrates the fluidity of the term.

Further, although Lifetime relies on *regulation* sizes to influence the PTO, Lifetime asserts that the specification's single reference to "residential" backboards "clearly" limits the scope,[77] meaning that the Artisan reading the intrinsic record would not know which scope—regulation or residential—to apply. The confusion gets worse. Lifetime's expert opines that the term is "reasonably clear in scope and meaning" because, "[i]n the industry when designing, manufacturing, or selling *residential* basketball systems, there is a standard range of sizes and configurations for basketball backboards. There is not an unlimited, indefinite range, the industry understands acceptable sizes and configurations for the game of basketball."[78] But this purportedly "clear" meaning gives no definable limits.

Even accepting "residential" as a limit, Lifetime's mention of "standard sizes" of residential systems and supporting extrinsic evidence actually demonstrate the indefiniteness of the "sized and configured" term. Lifetime's expert Allen testified that "standard size" is determined by the *marketplace*— by retailers' judgment about what size backboards to stock.[79] Thus "standard sizes" are just whatever sellers decide to market—if they sell it, it's "sized and configured." Relying on such external and after-the-fact judgment of market players imports subjectivity to the term, rendering it indefinite.[80] Further proving such lack of "reasonable certainty," Allen admitted that the marketplace for sizes for basketball backboards changes over time, and has even

---

[77] Dkt. 212-28, Allen Decl., ¶ 7.
[78] Dkt. 212-32, Allen Decl., ¶ 8 (emphasis added). *See also* Dkt. 211, at 13.
[79] Ex. 18, Allen Depo. at 48:7-12; 57:13-59:22.
[80] *Datamize, LLC v. Plumtree Software Inc.*, 417 F.3d 1342, 1351 (Fed. Cir. 2005) (holding "aesthetically pleasing" indefinite as being user-dependent) (overruled by *Nautilus* on other grounds).

since the '111 was filed.[81] Adopting Lifetime's construction would impermissibly render some basketball backboard sizes infringing in 2014 when they were non-infringing in 1998. Relying on "whatever standards exist or may evolve over time … would lead to a hopelessly indefinite construction."[82] And, the question of what it means at any given time cannot be left to the jury.[83]

Allen's testimony as to an Artisan's understanding of the term injects further confusion. He excludes "junior size" basketball backboards from the scope, even thought these systems (1) are sized between 18 and 32 inches;[84] (2) are used with a ball that is dribbled, shot toward the backboard, rebounds off the backboard, and can go through the hoop;[85] and (3) are sold for use in a residential setting.[86] Despite admitting that play with these products includes all these aspects, Allen asserts they are not "sized and configured for playing the game of basketball."[87] He attempts to justify the exclusion by observing that these systems do not have an 18 inch rim, but rim size is not discussed in the intrinsic evidence. He also inexplicably excludes backboards imported from China in the range of 24 to 32 inches that *did* have an 18 inch rim.[88] Even Lifetime's self-proclaimed Artisan cannot determine the objective bounds of this term.

Given this, no Court could divine objective boundaries of the "sized" requirement so a competitor could determine what's outside of the scope, and thereby develop a non-infringing

---

[81] *Id.*, 51:19-52:21. Lifetime's engineer reiterates that the thickness and size of backboards change in response to market demand. Ex. 10, Van Nimwegen Depo. 71:24-73:13.

[82] *In re Townshend Patent Litigation*, No. C 02-04833 JF, 2004 WL 1920049, at *13 (N.D. Cal. Aug. 26, 2004).

[83] *O2 Micro, 521 F.3d at 1361*.

[84] Ex. 18, Allen Depo., 54:17-55:23.

[85] *Id.*, 55:24-56:8.

[86] *Id.*, 62:20-25.

[87] *Id.*, 56:9-58:1.

[88] *Id.*, 50:7-16.

product.[89] Lifetime's expert states the problem succinctly: when asked, "What sizes of backboards would not be within the definition of sized that you've said the person of ordinary skill in the art would understand," Allen flatly responded, "I have no idea."[90]

Beyond the "sized" requirement, Lifetime does not address the "configured" aspect of "sized and configured" at all, even though these are two different parameters to an Artisan.[91] The Court is left to guess what "configuration" means. An Artisan would likely consider one aspect of a configuration to be the shape of the backboard, but Lifetime's expert offered no opinion as to whether an Artisan would consider shapes other than fan-shaped and rectangular to be "configured" for the game of basketball. When asked about the boundaries of possible shapes, Allen testified: "Q: And [an Artisan] as you've defined it would only consider it to be those two shapes? A: I can't comment to what somebody else might think. It might be some other option."[92] Yet again, a boundless term. Further, Allen testified that the concept of "configuration" also implicates numerous other parameters such as thickness, interaction with the backboard surface, and weight (which themselves depend on factors not addressed in the intrinsic evidence) that introduce even more uncertainty into the claim.[93] Russell's extrinsic evidence confirms this lack of reasonable certainty as to size, configuration, or the combination of the two.[94]

---

[89] "Otherwise, there would be a zone of uncertainty which [others] may enter only at the risk of infringement claims." *Nautilus*, 134 S. Ct. at 2129 (internal quotation omitted).
[90] Ex. 18, Allen Depo., 49:3-6.
[91] Allen testified that "size" and "configuration" are two different things. *Id.*, 48:1-2.
[92] *Id.*, 63:7-11.
[93] *See, e.g.*, *id.* 66:6-8 (Artisan "would not separate" the interaction of the frame and backboard); *id.* 73:7-13. (Artisan would consider weight of backboard as part of "sized and configured"); *id.* 73:14-74:12 (backboard can be too heavy to be "sized and configured," but only if Artisan knows what support system or frame is being used).
[94] Ex. 24, Reitman Decl., ¶ 24-26.

Neither the plain and ordinary meaning nor the intrinsic evidence defines the boundaries of this term, and Lifetime's arguments and extrinsic evidence only emphasize its uncertainty. If this term were left without construction (under the guise of having a "plain and ordinary meaning") a jury would have to supply one—which is precisely what *O2 Micro* forbids.[95] Yet the term is indefinite as to the scope of the "sized" and "configured" requirements, as well as due to its reference to the "game of basketball" as discussed in Section M.e below.

**L.    "adhesive provides [adhesion and flexibility] / [a bond] / flexibility in the bond]"**

| **P:** Plain and ordinary meaning | **D:** Indefinite, or if not indefinite, "the magnitude of [adhesion / strength / flexibility] is attributable solely to the adhesive" |
|---|---|

The terms beginning with "adhesive provides" are indefinite because, read consistently among the claims and intrinsic record, no single meaning makes sense as applied in all claim locations in which the phrase appears.[96] In fact, in some claims no meaning makes sense at all. Claim 1 of the '111 requires that the "adhesive provides" adhesion and flexibility "*to the acrylic backboard*" and also "*to the frame structure bonding surface.*" Similarly, Claim 12 requires that the "adhesive provides" adhesion and flexibility "*to the [backboard and frame] bonding surfaces.*" To say an "adhesive provides…flexibility" to a " bonding surface" or "backboard" is nonsense.[97] On its face, this would require the adhesive to *make* the surface flexible. Adhesives do not make the bonding surfaces more or less "flexible;" they simply adhere to them.[98] It may be logical to speak of providing flexibility <u>between</u> these surfaces, or <u>to the bond</u> that joins them, as other claims recite (e.g., '111 Claim 17 and 28). But this is *not* what Claims 1 and 12 recite. That

---

[95] *O2 Micro*, 521 F.3d at 1361.
[96] *Sitrick v. Dreamworks, LLC*, Case No. CV 03-4265-SVW, 2006 U.S. Dist. LEXIS 97312, at *44 (C.D. Cal. July 21, 2006) (finding indefiniteness where no single construction made a term intelligible as used across the claims).
[97] Ex. 24, Reitman Decl., ¶ 15-16.
[98] *Id.*

Lifetime knew how to articulate the concept in claims 17 and 28 suggests that the different rendering in Claims 1 and 12 is intentional. If the manner in which the adhesive "provides" characteristics is even slightly different in each context, its meaning is not be "plain and ordinary." But nothing in the intrinsic evidence makes the actual meaning or its nuances "reasonably certain."

The Court cannot salvage the term using a hazy gloss, such as the "adhesive has" the strength and flexibility required. First, this would impermissibly change an active verb "provides" into the passive verb "has," which would change the meaning of the claims. The intrinsic evidence also forecloses that possibility. Claim terms must be construed similarly across related patents.[99] Claim 1 of the related '463 Patent states the adhesive "*has* sufficient flexibility and adhesion,"[100] yet Claim 26 (depending from Claim 1) adds that the "adhesive *provides* sufficient flexibility in the bond."[101] Lifetime drew a distinction between qualities an adhesive "has" and qualities it "provides." Lifetime differentiated those terms; the Court should likewise.[102]

**Alternatively,** if the "adhesive provides" terms are not indefinite, then the intrinsic evidence constrains them to mean that the various qualities identified in the terms are attributable *solely* to the adhesive, not some other part of the basketball system. Lifetime's stated position before the PTO, a position restated in the week ***after*** filing its claim construction brief, is that the phrase means "the adhesive *itself* provides" the claimed characteristics to the exclusion of nearby

---

[99] *AbTox, Inc. v. Exitron Corp.*, 131 F.3d 1009, 1010 (Fed. Cir. 1997). *See also Microsoft Corp. v. Multi-Tech Sys. Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004) (a statement regarding a term during prosecution of a child patent limited that term in the parent patent).
[100] Ex. 29, U.S. Pat. No. 8,845,463 (" '463 Patent"), Claim 1 (emphasis added).
[101] Ex. 29, '463 Patent, Claim 26 (emphasis added).
[102] *Tandon Corp.*, 831 F.2d at 1023.

structures.[103] These statements demonstrate that if the phrase carries any meaning at all, it is that the claimed performance characteristics are attributable solely to the adhesive.

### M.   The Sufficiency Terms

| **P:** Plain and ordinary meaning for all terms | **D:** Indefinite for all Sufficiency Terms |
|---|---|

      Lifetime's sufficient adhesive is just like the "fragile gel" found to be indefinite in *Halliburton*.[104] *Halliburton* controls, and we attach a highlighted copy as Appendix A. Halliburton claimed a gel that became "more liquid like under stress… but which quickly returns to gel" when the stress is removed.[105] Even under the pre-*Nautilus* standard, the Federal Circuit found "fragile gel" indefinite because it lacked objective boundaries: "it is ambiguous as to the requisite degree of the fragileness of the gel, the ability of the gel to suspend drill cuttings (*i.e.*, gel strength), and/or some combination of the two."[106] Moreover, Halliburton claimed function at the point of novelty—that is, Halliburton described its gel by what it *did*, rather than by what it *was*.[107] The Federal Circuit emphasized that "the task of determining whether [a purely functional] limitation is sufficiently definite is a difficult one that is highly dependent on context"—and that a "quantitative metric" or "formula for calculating a property" would assist greatly.[108] The Sufficiency Terms suffer from all these defects: "sufficient" means *it works under the right circumstances* just like "fragile" means *it turns liquid under the right stresses*. The degree of strength and flexibility are ambiguous and an Artisan cannot know how to balance them. And,

---

[103] Ex. 30, 381 Rex., Respondent Brief, at 6 (Dec. 1, 2014).
[104] *Halliburton Energy Servs. v. M-I LLC*, 514 F.3d 1244 (Fed. Cir. 2008).
[105] *Halliburton*, 514 F.3d at 1247.
[106] *Id*. at 1256.
[107] *Id*. at 1255.
[108] *Id*. at 1255–56.

just like "nothing in [Halliburton's] specification suggests what degree of [fragility] is sufficient,"[109] Lifetime does not define what degree of strength and flexibility produce "sufficiency."

With this framework in mind, each of the phrases beginning with "sufficient" (the "Sufficiency Terms") is indefinite because (a) the law requires these three terms each mean something distinct, and yet there is no basis for understanding a difference among them; and (b) even if they were impermissibly collapsed to a single concept, the Sufficiency Terms are merely a vague, outcome-driven performance criteria that lacks any objective boundary.[110] By using and combining three different Sufficiency Terms, the claims themselves introduce ambiguity into the scope of each such term. By indicating that the competing values of strength and flexibility must be balanced, the specification adds further confusion and fails to give any meaningful guidance. And the file history does not resolve the confusion—it perpetuates the confusion with ever-evolving interpretations, demonstrating the lack of objective boundary. (Lifetime ignores all these issues.) The Sufficiency Terms are therefore indefinite.

### a. The Three Sufficiency Terms Must Have Distinct Meanings.

The claims contain not one, but three distinct Sufficiency Terms. Because of the way these terms appear in the claims, each term must have a distinct meaning. But the record supplies no basis to differentiate them with reasonable clarity. Lifetime attempts to sidestep this problem by advocating for a unified "plain and ordinary meaning" (supported by generalities), but its argument invites error. Claim construction is the Court's purview and a jury cannot decide the differences in scope between and among the various Sufficiency Terms.[111]

---

[109] *Id.* at 1254.
[110] *Interval Licensing*, 766 F.3d at 1370-71.
[111] *Markman*, 517 U.S. 370 (1996); *O2 Micro*, 521 F.3d at 1361.

Three doctrines require that the Sufficiency Terms must have different meanings:  (1) no claim limitations are superfluous, (2) claim differentiation, and (3) statutory double patenting. ***First***, as to rendering limitations superfluous, where two terms are expressly recited in a single claim, the terms "cannot mean the same thing."[112] Because "sufficient strength and flexibility" and "sufficient flexibility in the bond" each expressly appear in each of Claims 17 and 24 of the '935, the Court *must distinguish* these terms from one another. ***Second***, the presumption of claim differentiation, though not inviolable, applies most strongly here because the "only meaningful difference" between a dependent and independent claim is the language that the party would like to construe in the same manner.[113] Claims 1 and 9 of the '935 present precisely this situation: Claim 1 includes the "sufficient strength and flexibility" phrase, and dependent Claim 9 differs only by adding "sufficient flexibility in the bond to dissipate impact energy." In fact, Lifetime's ongoing arguments before the PTO confirm that these limitations are separate requirements. In its PTO Reexam briefs (filed a week after its claim construction brief), Lifetime relies on *both* of these phrases as independent limits on the claimed backboard assemblies.[114] ***Third***, the limitations "sufficient adhesion and flexibility" and "sufficient strength and flexibility" must mean different things, else Claim 1 of the '111 and Claim 16 of the '935 would have identical scope and be invalid due to statutory double patenting. Claim 16 of the '935 (which depends from Claim 1 of the '935) includes all limitations of Claim 1of the '111, except that the claimed adhesive provides "sufficient *strength* and flexibility" rather than "sufficient *adhesion* and flexibility." Life-

---

[112] *Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841, 848 (Fed. Cir. 2006).
[113] *Wenger Mfg.*, 239 F.3d at 1233.
[114] *Ex. 30*, 381 Rex., Respondent Brief, at 10, 17 (Dec. 1, 2014) (listing out and emphasizing both of these terms as allegedly ignored by Russell).

time's proposed interpretation before this Court reads out that sole distinction. If "the same invention is being claimed twice, 35 USC 101 forbids the grant of the second patent."[115]

By seeking "plain and ordinary meaning," Lifetime ignores the need to ascribe different meanings to the Sufficiency Terms. But accepting "plain and ordinary" meaning would impermissibly leave the question of scope to the jury.[116] It would also collapse the meanings of all three Sufficiency Terms into one concept (thereby violating the principles discussed above). Lifetime articulates but one alleged ordinary meaning for all three Sufficiency Terms (and the "sized and configured…" term as well): "[T]he alleged indefinite language merely means that the adhesive is strong enough and is flexible enough that the basketball backboard can be used to play a *real* game of basketball." (Dkt. 211, at 11) (emphasis in original). Accepting this meaning would render claim language superfluous, ignore claim differentiation, create a statutory double patenting rejection, and leave claim scope questions to the jury. It would also fail to credit Lifetime's extensive efforts in prosecution history to give the Sufficiency Terms definite meanings to distinguish prior art.

**b.  Lifetime Offers Differing Interpretations to the PTO and the Court.**

Further impairing the ability of an Artisan to understand the meaning of these Sufficiency Terms, the intrinsic record shows Lifetime arguing an evolving litany of requirements allegedly associated with these terms. Lifetime's proffered "plain and ordinary meaning" for the Sufficiency Terms ignores the twists and turns of the prosecution history at the PTO, but the Court cannot

---

[115] *In re Vogel*, 422 F.3d 438, 441 (C.C.P.A. 1970).
[116] *O2 Micro*, 521 F.3d at 1361.

ignore that history. "A patent may not, like a 'nose of wax,' be twisted one way to avoid antici-pation and another to find infringement."[117]

The intrinsic record expresses that the Sufficiency Terms connote *specific*, quantifiable measurements, not vague circumstances. Lifetime argued at the PTO that the presence of specific metrics for these characteristics in the Patents distinguished prior art, telling the examiner in 2008 that "none of the [cited prior art] address the *specific cushioning, adhesion and flexibility requirements* to bond an acrylic backboard to a frame."[118] That 2008 brief did not outline those "specific" requirements, but Lifetime fleshed out those specific, objective requirements for "suf-ficiency" in the Reexams by telling the PTO that it conducts the following "standard tests:" "(1) shooting basketballs at the backboard at 35 mph (which has the equivalent energy of being hit with a baseball at 73 mph); (2) applying a 450 lb. load at the front of the rim (which generates a force over 4,000 lbs. on the backboard frame); and (3) dropping a 106 lb. load on the front of the rim from a height of four inches (4") 15,000 times."[119] In seeking allowance, Lifetime empha-sized these "standard tests"—it never suggested testing against a "real" game of basketball, or that the Sufficiency Limits "merely mean" usefulness for such a use.  The amorphous definition Lifetime advances now is completely opposed to the objective definition currently presented to the PTO.

The intrinsic record also reflects that Lifetime's "standard tests" change in number and description as necessary to overcome continued rejections:

---

[117] *Amazon.com Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) (internal citations omitted).
[118] Ex. 31, 111 FH, Amended Appeal Brief, at 16 (Feb. 28, 2008) (emphasis added).
[119] Ex. 30, 381 Rex., Respondent Brief, at 17 n.13 (Dec. 1, 2014).

| Date | New Test |
|------|----------|
| 1/11/1999 | Specification filed describing a *torque test* ("the "Torque Test"). (4:37-67) |
| 9/17/2001 | In response to rejection over Nunes, Lifetime describes the *35 mph "basketball impact test"* that "was developed by Lifetime" (i.e., not a standard industry test), and states this test "combined with the torque deflection test" show the requisite "adhesion, flexibility, and durability."[120] |
| 2/28/2008 | In response to references cited by the examiner following the first Board appeal, Lifetime informs PTO that the bonding method must "prevent the backboard from breaking or cracking due to," among other forces, "*dunking a basketball*." [121] The Board later cites dunks as forces that must be overcome to show sufficiency.[122] |
| 2/8/2013 | In response to Russell's prior art, Lifetime informs the PTO that passing the *35 mph basketball impact test is a requirement* for being deemed sufficient,[123] and that the adhesive must *accommodate differing rates of thermal expansion*.[124] |
| 2/28/2014 | After repeated rejections by examiner in view of prior art cited by Russell, Lifetime argues (without proof) that (1) the adhesive on the backboard must withstand 100,000 impacts, (2) be "*designed to with stand an 80 mph wind*;" (3) the backboard must survive intact after a *weight of 450 lbs is hung on the rim for 5 minutes*; and (4) "to withstand dunking, a standard test . . . is *dropping a 106 lb. load on the front of the rim from a height of four inches . . . 15,000 times.*"[125] |

Thus, over the course of 15 years, Lifetime variously asserts at least 7 different tests to determine sufficiency, including torque, basketball impact, thermal expansion, 100,000 impact, basketball retention, rim hang, and weight drop tests. These tests do nothing to identify objectively the patent-mandated "balance" between the opposing parameters of strength and flexibility, (2:51-55; 4:7-8), so they are inconsistent with the specification and fail to provide the required definite claim scope. Ultimately, the intrinsic record shows Lifetime tethering "sufficiency" to an ever-changing litany of ad-hoc tests, none of which speak to the central problem of the patent: if sufficient means "it works," how does an Artisan know when it works? The file histo-

---

[120] Ex. 32, Ward Decl., ¶¶ 4, 6, 10.
[121] Ex. 31, 111 FH, Amended Appeal Brief, at 16 (Feb. 28, 2008).
[122] Ex. 33, 111 FH, Decision of Board, at 12 (Apr. 27, 2010) (citing the sentence on dunking).
[123] Ex. 9, Stevens Decl., ¶ 13; Ex. 34, Holstein Decl., ¶ 17.
[124] Dkt. 212-6 (Winter Decl., ¶ 5).
[125] Ex. 28, 654 Rex., Appeal Brief, at 29-30 (Feb. 28, 2014).

ries do not give the Sufficiency Terms objective boundaries. Lifetime's argument that this plain and ordinary meaning "merely means that the adhesive is strong enough and flexible enough" obscures their meanings and fails to inform the jury of the rigor Lifetime asserted to the PTO was necessary to combine prior art references in an obviousness analysis.

The examiner's withdrawal of indefiniteness rejections in the original '935 and '550 proceedings does not compel a different conclusion. That withdrawal occurred before Lifetime's recent allegations of rigorous "standard testing" introduced the confusion addressed above,[126] and before the Supreme Court required "reasonable certainty" in *Nautilus*. Under the proper standard, Lifetime's response to the indefiniteness rejections actually evidences lack of reasonable certainty, as Lifetime argued that each Sufficiency Term "*could mean*" the verbatim language appearing in the claim.[127] If anything, this admits the terms *could mean* something else as well.

### c. VHB and The Torque Test Do Not Resolve The Ambiguity.

Despite having espoused the need for "specific" measures and "standard tests" at the PTO, Lifetime tells this Court that the measure of sufficiency "can be evaluated with reference to the strength and flexibility of conventional VHB double-sided tape." (Dkt. 211, at 12). Note Lifetime's careful wording: the invitation to "evaluate with reference to" VHB tape is conspicuously precise that the performance of double-sided tape does not alone establish sufficiency. By identifying VHB as a potentially-objective reference point, Lifetime carefully avoids clarity as to whether, by how much, and in what circumstances the performance of an adhesive can differ from the performance of VHB tape and still be "sufficient." Relying on Lifetime's position would impermissibly leave a known ambiguity to the jury to resolve.

---

[126] *Compare* Dkt. 212-9 (dated 06/07/11), *with supra* showing tests first presented in 2013-14.
[127] (Dkt. 212-19, at 12-13); (Dkt. 212-21, at 8-9).

28

In any event, the intrinsic evidence does not permit an Artisan to rely on VHB tape as a reference point. The specification discloses that the Torque Test allegedly establishes a "base-line" from VHB tape (4:37-58), but this test *creates*, rather than resolves, ambiguity. Notably, Lifetime ignores this test in its brief, apparently recognizing its shortcomings. But an Artisan cannot ignore the Torque Test, nor its attendant ambiguity, for four reasons:

*First*, the intrinsic record shows that the Torque Test cannot demonstrate compliance with any Sufficiency Term. The inventor Stevens informed the PTO in 2013 that the Torque Test qualified an adhesive for *further testing*; it did *not* qualify an adhesive for use in backboards.[128] In his deposition, Stevens confirmed that the Torque Test is merely a "pre-test."[129] Also, despite the statement in the specification that the adhesive was tested against a VHB baseline, Lifetime told the Board that the prior art tape "does *not* provide a secure connection" meaning the new adhesive should perform *better* than VHB tape.[130] The Artisan reading these statements would understand that VHB is not an adequate standard of sufficiency. Because Lifetime disavowed the only possible metric for sufficiency in the specification, the Artisan is left without objective standards for any of the Sufficiency Terms, and they are therefore indefinite.

*Second*, even if "conventional VHB tape" were a standard for evaluating the claimed adhesives, the record does not specify *which VHB tape* to consider. Both parties' experts note that there are (and in 1999, were) multiple types of VHB tape having varying thickness, foam hard-

---

[128] Ex. 9, Stevens Decl., ¶ 12.
[129] Ex. 8, Stevens Depo., 166:2-22.
[130] Ex. 19, 111 FH, BPAI Oral Hearing, at 3:14 (emphasis added); *see also* Ex. 35, Stevens Supp. Decl., ¶ 9 (stating that Hying's problems with double-sided tape "include[ed] insufficient strength" and "high susceptibility to cracking"); Ex. 36, 377 Rex., Office Action Resp., at 36 (Feb. 8, 2013) (the "required adhesion and flexibility was *unknown*," yet VHB tape was known).

ness, and adhesive strength.[131] Yet the intrinsic evidence completely fails to identify which of the myriad VHB tapes is used (or is to be used). Without this information, an Artisan cannot reproduce the Torque Test, or compare a potential adhesive's performance against the results.

*Third*, even if an Artisan knew which VHB tape to consider, the need for "balanc[ing]" adhesion and flexibility, (2:51-55; 4:7-8), creates irreducible uncertainty. "If the bond between the backboard and frame is too rigid, then the backboard can fracture. If the bond is too loose, then the adhesion fails." (1:28-30). The inherent tension between the competing attributes of strength and flexibility can be solved only by resorting to a subjective Goldilocks solution—the "sufficient" bond must not be too rigid or too loose, but "just right."[132] Is the VHB tape performance given in the specification "just right," or is it rather the catalyzed silicone adhesive's performance? And how far can one stray from those test results and still be "just right?" Neither the specification nor the file history informs the Artisan of any objective bounds for "just right," so these terms of degree are indefinite.[133]

*Finally*, even assuming an Artisan could overcome the foregoing unknowns, the specification's description of the Torque Test is hopelessly confusing. The specification's entire description of the testing event is as follows: "[An] electronic level and torque wrench were then used to obtain a degree of deflection and a torque force at failure." (4:53-54). This description omits critical details like what speed and force of pull to apply and what particular motion to use in the test. Conducting the test on the same adhesive at different speeds yields different results.

---

[131] Ex. 7, Petrie Depo., at 127:23-128:16; Ex. 24, Reitman Decl., ¶ 10.
[132] *Cf. Flexsys Am. LP v. Kumho Tire U.S.A., Inc.*, 695 F. Supp. 2d 609, 624 (N.D. Ohio 2010) ("Plaintiff's 'Goldilocks' definition of 'controlled amount of protic material'—not too little and not too much, but just the right amount—would render the patents indefinite.").
[133] *Interval Licensing*, 766 F.3d at 1370-71.

Without specifying the speed and force of pull specified, the deflections mentioned in the speci-

fication are meaningless. An Artisan cannot compare tests of new adhesives to the results in the

specification.[134] Even the *motion* of the test is unclear: the description does not indicate whether

the torqueing motion is about an axis perpendicular to the acrylic or parallel to the acrylic. Twist-

ing about a perpendicular axis creates a shear stress, while twisting about the parallel axis creates

a cleavage or peel stress. These two modes of stressing an adhesive are different and cannot be

correlated.[135] The ambiguity is comically evident in the depositions: The inventor applied the

force about the parallel axis, creating a peel stress,[136] while Lifetime's adhesives expert applied

the force about the perpendicular axis, creating a shear stress.[137] The test is vague and indefinite.

Of course, even if all of these problems were somehow surmounted, the Artisan would

still have no idea which Sufficiency Term is satisfied by successful testing, or how to differenti-

ate the Sufficiency Terms.

### d.  Lifetime's And Russell's Tests Prove the Subjective Nature of the Terms.

Lifetime's reliance on tests besides the Torque Test highlights lack of reasonably certain

definition of the Sufficiency Terms. First, contrary to Lifetime's statements to the PTO, there are

no "standard tests" in the industry. Lifetime's asserted tests are different from the 1998 ASTM

standards (which test for backboard stability, not adhesive performance).[138] Because the specifi-

cation does not disclose these non-standard tests, an Artisan would not know to apply them in

evaluating sufficiency. Adopting them as the construction of the Sufficiency Terms would also

---

[134] Ex. 24, Reitman Decl., ¶ 32-37.

[135] *Id.*, ¶ 35.

[136] Ex. 8, Stevens Depo., 192:17-194:22 (explaining configuration and pulling wrench "up").

[137] Ex. 7, Petrie Depo., 144:16-19 (calling it a "shear" test, acrylic rotated parallel with tube).

[138] Ex. 37, 377 Rex., Response to ACP (June 4, 2014), Ex. H (ASTM F 1882-98, § 6 (1998)) ("1998 ASTM Standards").

result in invalidity due to lack of written description.[139] Moreover, Lifetime asserted all back-boards are designed to withstand 80 mph winds, but this is not the standard an Artisan would recognize. The 1998 ASTM standards prescribe testing the stability of portable backboards only to 40 mph.[140] ████████████████████████

████████████████████████████████████████████████████

████████████████ Because these tests were not and would not have been known by Artisans to test adhesive performance in 1999, they cannot be used to prove "sufficient" adhesion, strength, and flexibility now.[142]

To overcome these deficiencies in the Sufficiency Terms arising from Lifetime's statements in the intrinsic record, Lifetime relies on extrinsic, post-hoc depositions from three Russell engineers. (Dkt. 211, at 13.) But this testimony has little value because, as Lifetime knows, the terms must be construed by an Artisan "in view of the specification *and the prosecution history.*"[143] Lifetime cites no testimony that these engineers had read the file histories or knew of Lifetime's statements therein. Accordingly, their testimony as to the meaning of the Sufficiency Terms is entitled to no substantial weight. Fed. R. Evid. 701(c) & 702(b).

More importantly, Lifetime argues that "Russell's engineers have had no problem developing common sense tests to measure the strength and flexibility of the bond." (Dkt. 211, at 13.) The flaw in this argument is that *Russell and Lifetime use different tests and standards for bond performance.* ████████████████████████

---

[139] *N. Am. Vaccine Inc. v. Am. Cynamid Co.*, 7 F.3d 1571, 1577 (Fed. Cir. 1993) (rejecting construction that would result in written description invalidity).
[140] *Compare id.*, § 6.1.1 (40 mph winds for portables), *with id.*, § 6.2.1 (80 mph for in-grounds).
[142] ██████████ *Nautilus* (must construe at time of filing).
[143] *Nautilus*, 134 S. Ct. at 2129.

████████████████████████████████████████████████

████████ Assemblies may pass Russell's test but fail Lifetime's, and vice versa. As a result, Lifetime's argument asserts that a backboard may either infringe or not depending solely on which tests and standards an Artisan uses for "sufficient" adhesion, strength, or flexibility. This "requires that an artisan make a separate infringement determination for every set of circumstances [and is] likely to result in different outcomes (sometimes infringing and sometimes not)[;] that construction is likely to be indefinite."[146] Because an embodiment could both infringe and not infringe due to multiple possible standards, "[t]hat is the epitome of indefiniteness."[147]

**e.   "The Game of Basketball" Is No More Objective Than "Sufficient."**

The Sufficiency Terms share a common phrase that contributes significantly to their lack of definiteness: "*the* game of basketball." (Emphasis added). Lifetime added this phrase to limit the scope of the claims and avoid prior art,[148] but neither the specification nor the file history provide guidance as to the meaning of the phrase.[149] Lifetime's current argument—that basketball means "the *real* game of basketball" (Dkt. 211, at 11) (emphasis in original)—sheds no light. Putting the word "*real*" in front of a phrase does not help define the phrase; instead, it injects more subjectivity and further obscures the intended meaning.[150]

According to Lifetime, the "real" game of basketball excludes only games played on "a toy or novelty item" using "wads of paper or a light foam ball." (Dkt. 211, at 11.) But Lifetime's

---

[144] Lifetime Dkt. 211-1 ████████████████████████████ (unredacted under seal).
████████████████████
[146] Halliburton, 514 F.3d at 1254-55.
[147] Geneva Pharms., Inc. v. GlaxoSmithKline PLC, 349 F.3d 1373, 1384 (Fed. Cir. 2003).
[148] Ex. 27, 111 FH, Office Action Resp., at 2-3 (Mar. 12, 2001).
[149] The phrase "game of basketball" appears only once in the specification. (1:14-16).
[150] Interval Licensing, 766 F.3d at 1370-71 (requiring "objective boundaries").

expert Allen had a different take when asked about "the game of basketball" in the context of "junior sized"[151] assemblies. Though he called them junior "basketball systems" and agreed that such products use a ball that may be dribbled and shot at and rebounded off the backboard, Allen asserted that these assemblies are not for "the game of basketball" because they lack "an 18-inch diameter rim."[152] Nothing in the patents supports linking "the game of basketball" to a particular rim size; rim size appears nowhere in the specification.[153] If this were not confusing enough, Allen said it is "impossible to answer" whether the game of basketball can be played with smaller rims.[154] Each Sufficiency Term is directed for use with "the game of basketball," but Lifetime offers no objective boundary as to what isn't "the game of basketball."

Lifetime has recently told the PTO that, whatever "the game of basketball" means, the "specification is entirely consistent and explains the patent is directed towards basketball backboards for residential basketball systems."[155] Lifetime's argument improperly imports a limit to the claims from the specification.[156] Further, Claim 25 of the related '463 Patent[157] of this same patent family, which claims "residential" systems, forecloses reliance on that limit to define "the game of basketball," as it violates claim differentiation.[158] Even so, the term "residential" has no defined scope.[159] The notion that the Sufficiency Terms intend sufficiency for the "real" game of

---

[151] Ex. 18, Allen Depo., 54:17-55:23.
[152] Id., 56:10-15.
[153] Id., 56:16-19.
[154] Id., 54:6-10.
[155] Ex. 17, 377 Rex., Respondent Brief, at 7 (Dec. 1, 2014).
[156] Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 989-90 (Fed. Cir. 1999).
[157] '463 Patent, Claim 1 is directed to "[a] method of constructing a basketball backboard" while depending Claim 25 states "the basketball backboard is for a residential basketball system."
[158] NTP, Inc., 418 F.3d at 1293 (requiring consistent interpretation across related patents).
[159] The 1998 ASTM standards for residential basketball systems define "normal use" as "safe-play modes that conform to the instructions that accompany the equipment." Ex. 37, 1998

*residential* basketball provides no clarity—an Artisan would understand that residential play has no defined regulations, is conducted in an uncontrolled environment, and, removes the presence on an official who can limit abusive play directed towards the backboard.

The Sufficiency Terms measure "sufficiency" towards playing "the game of basketball." However, a competitor cannot avoid infringement because "sufficiency" lacks objective boundaries and he lacks reasonable certainty as to what "the game of basketball" means in context.

For all the reasons set forth above, the Sufficiency Terms are indefinite. Russell has proposed alternative constructions, but adopting those constructions would result in the claims being invalid for lacking written description. If the Court adopts Russell's constructions, Russell will move for summary judgment of invalidity on the basis of the Court's claim construction order.

Dated: December 12, 2014

By: ___/s/ Jeffrey D. Dyess_____
Nathan W. Johnson
Jeffrey D. Dyess
Jacob W. Neu
Thomas Richie
BRADLEY ARANT BOULT CUMMINGS
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203-2119
T.:205-521-8000
F: 205-521-8800
jneu@babc.com

OF COUNSEL:
Edgar R. Cataxinos
TRASK BRITT
230 South 500 East, Suite 300
Salt Lake City, UT 84102
T: 801-532-1922
F: 801-531-9168
ERCataxinos@traskbritt.com

Attorneys for Defendant Russell Brands, LLC

---

ASTM Standards, § 3.1.10. Thus, "normal use" depends on the manufacturer's then-preferred instructions, not an objective standard.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 12th day of December, 2014, a true and correct copy of the foregoing RUSSELL BRANDS, LLC'S RESPONSIVE CLAIM CONSTRUCTION BRIEF was electronically filed with the Clerk of the Court and delivered by email to the following:

Jared J. Braithwaite
David R. Wright
MASCHOFF BRENNAN
201 South Main Street
Suite 600
Salt Lake City, UT 84111

Kirk Harris
MASCHOFF BRENNAN
1389 Center Drive
Suite 300
Park City, UT 84098

/s/ Jacob W. Neu
Jacob W. Neu