Nathan W. Johnson
Jeffrey D. Dyess
Jacob W. Neu
J. Thomas Richie
BRADLEY ARANT BOULT CUMMINGS, LLP
1819 Fifth Avenue North
Birmingham, AL 35203
T: 205-521-8000
F: 205-521-8800
njohnson@babc.com
jdyess@babc.com
jneu@babc.com

Edgar R. Cataxinos
Magleby Cataxinos Greenwood
170 South Main Street, Suite 1100
Salt Lake City, UT 84101
T: 801-359-9000
F: 801-359-9011
Cataxinos@mcgiplaw.com

Attorneys for Defendant
Russell Brands, LLC

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH
### NORTHERN DIVISION

| | |
|---|---|
| LIFETIME PRODUCTS, INC., a Utah corporation,<br>　　　Plaintiff,<br><br>RUSSELL BRANDS, LLC, D/B/A SPALDING, a Delaware limited liability company,<br><br>　　　Defendant. | Case No. 1:12-cv-00026-DN<br><br>**RUSSELL BRANDS, LLC'S OPENING SUPPLEMENTAL CLAIM CONSTRUCTION BRIEF**<br>Honorable District Judge David Nuffer<br>Honorable Magistrate Judge Evelyn Furse |

**TABLE OF CONTENTS**

TABLE OF CONTENTS                                                          ii

TABLE OF AUTHORITIES                                                       iii

TABLE OF EXHIBITS                                                          v

INTRODUCTION                                                              1

    I.      LEGAL STANDARDS GOVERNING CLAIM CONSTRUCTION        1

    II.     DISPUTED TERMS                                       1

    a.  "Liquid"                                               1

    b.  "Single Layer of…adhesive"/"Single Layer of Adhesive of the Same Material"   3

    c.  "Direct[ly]"                                           7

    d.  "[Backboard] Bonding Surface [of the Backboard]"         8

    e.  "Adhesive Has/Having" is Indefinite.                   10

    f.  "Elastic Bonding" Is Indefinite.                       12

    g.  "Securely Connect" is Indefinite.                     16

    h.  The Sufficiency Terms are Indefinite.                 18

CONCLUSION                                                               25

# TABLE OF AUTHORITIES

## CASES

*Carlton v. Bokee,* 84 U.S. 463 (1873)

*Markman v. Westview Instr., Inc.*, 517 U.S. 370 (1996)

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014)

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831 (2015)

*Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318 (Fed. Cir. 2013)

*Digital Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270 (Fed. Cir 2012)

*D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570 (Fed. Cir. 1985)

*Dow Chem. Co. v. Nova Chems. Corp.*, 803 F.3d 620 (Fed. Cir. 2015)

*Halliburton Energy Servs. v. M-I LLC*, 514 F.3d 1244 (Fed. Cir. 2008)

*InterDigital Comms., LLC v. Int'l Trade Comm'n*, 690 F.3d 1318 (Fed. Cir. 2012)

*Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364 (Fed. Cir. 2014)

*K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356 (Fed. Cir. 1999)

*Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898 (Fed. Cir. 2004)

*Media Rights Techs., Inc. v, Capital One Fin. Corp.*, 800 F.3d 1366 (Fed. Cir. 2015)

*Modine Mfg. Co. v. U.S. Int'l. Trade Comm'n,* 75 F.3d 1545 (Fed. Cir. 1996)

*O2 Micro v. Beyond Innovation Tech. Co.*, 521 F.3d 1351 (Fed. Cir. 2008)

*Paragon Solutions, LLC v. Timex Corp.*, 566 F.3d 1075 (Fed. Cir. 2009)

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc)

*Sunrace Roots Enter. Co. v. SRAM Corp.*, 336 F.3d 1298 (Fed. Cir. 2003)

*Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362 (Fed. Cir. 2012)

*Trustees of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359 (Fed. Cir. 2016)

*Versa Corp. v. Ag-Bag Int'l Ltd.*, 392 F.3d 1325 (Fed. Cir. 2004)

*Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225 (Fed. Cir. 2001)

*Ind. Pneumatic Tool Co. v. Chicago Pneumatic Tool Co.*, 96 F. Supp. 70 (N.D. Ill. 1951)

*Lifetime Prods., Inc. v. Correll, Inc.*, 323 F. Supp. 2d 1129 (D. Utah 2004)

*Maytag Corp. v. Electrolux Home Prods., Inc.*, 411 F. Supp. 2d 1008 (N.D. Iowa 2008)

*Venturi Jet Sets, Inc. v. Custom Molded Products, Inc.*, 124 F. Supp. 3d 1195 (D. Utah 2015)

Letter Order, *Sucampo, AG v. Dr. Reddy's Labs., Inc.*, No. 14-7114 (MAS) (Mar. 4, 2016 D.N.J.) (unpublished)

STATUTES

35 U.S.C. § 112, para. 2 (pre-AIA)

35 U.S.C. § 112, para. 4 (pre-AIA)

REGULATIONS

37 C.F.R. § 1.75(b)

**TABLE OF EXHIBITS**

| EXHIBIT | DOCUMENT |
| --- | --- |
| **1** | U.S. Patent No. 7,749,111 (" '111 Pat.") |
| **2** | U.S. Patent No. 8,033,935 (" '935 Pat.") |
| **3** | U.S. Patent No. 8,038,550 (" '550 Pat.") |
| **4** | U.S. Patent No. 8,845,463 (" '463 Pat.") |
| **5** | U.S. Patent No. 8,852,034 (" '034 Pat.") |
| **6** | App. No. 13/270,149, Response to Office Action (June 11, 2012) |
| **7** | App. No. 13/270,149, Response to Final Office Action (Jan. 30, 2013) |
| **8** | App. No. 13/275,174, Non-Final Office Action (Mar. 2, 2012) |
| **9** | App. No. 13/275,174, Response to Final Office Action (Mar. 25, 2013) |
| **10** | App. No. 13/275,174, Response to Office Action, (Sept. 4, 2012) |
| **11** | App. No. 13/275,174, Response to Office Action (Nov. 12, 2013) |
| **12** | App. No. 13/275,174, Response to Final Office Action (May 5, 2014) |
| **13** | App. No. 09/228,325, Response to Office Action (Nov. 17, 2000) |
| **14** | App. No. 09/228,325, Record of Oral Hearing (Apr. 13, 2010) |
| **15** | Excerpts from Feb. 5, 2015 Hearing Transcript |
| **16** | Excerpts from Nov. 11, 2014 Deposition of David Allen ("Allen Depo. I") |
| **17** | Excerpts from Apr. 6, 2016 Deposition of David Allen ("Allen Depo. II") |
| **18** | Excerpts from Jan. 25, 2016 Deposition of Lifetime Products for which the 30(b)(6) representative was Richard Gilmore ("Gilmore Depo.") |
| **19** | Excerpts from Apr. 8, 2016 Deposition of Stephen McCarthy ("McCarthy Depo.") |
| **20** | Excerpts from Nov. 12, 2014 Deposition of Edward Petrie ("Petrie Depo.") |

21       Excerpts from Aug. 20, 2014 Deposition of Lifetime Products for which the 30(b)(6) representative was Edward Van Nimwegen ("Nimwegen Depo.")

22       GE Silicones, "Preliminary Product Data Sheet" (1998)

23       Dow Corning, "Information About Specialty Materials for High Technology Applications" (1998)

24       Dow Corning, Advertisement (1969)

25       Bostik Findley, Material Safety Data Sheet (2003)

26       Lifetime's Discloser [sic] of Expert Witnesses Regarding Supplemental Claim Construction

27       U.S. Pat. No. 5,839,982 ("Hying")

28       Excerpts from American Heritage Dictionary of the English Language (3d ed. 1992)

29       Excerpts from Webster's Ninth New Collegiate Dictionary (1991)

30       Excerpts from Webster's New World Dictionary of American English, (3d college ed. 1988)

31       Rex. Nos. 95/002,377, 95/002,381, Nov. 19, 2015 Hearing Transcript

32       Plaintiff Lifetime Products. Inc.'s Infringement Contentions, Ex. 1

33       Letter Order, *Sucampo, AG v. Dr. Reddy's Labs., Inc.*, No. 14-7114 (MAS) (Mar. 4, 2016 D.N.J.) (unpublished)

34       Declaration of Maureen Reitman (Apr. 22, 2016)

35       App. No. 13/270,149, Response to Office Action (Sept. 25, 2013)

36       Declaration of Jacob Neu (Apr. 22, 2016)


APPENDIX A       **Chart of Parties' Disputed Constructions**

APPENDIX B       **Comparison of Claims 1, 17, 18, and 34 of '034 Patent**

APPENDIX C       **Chart Showing Various "Sufficient Flexibility . . . to Dissipate" Phrases in Claims**

# INTRODUCTION

Russell requests the Court to construe the terms identified in Doc. 347-2 as set forth below.

## I.   LEGAL STANDARDS GOVERNING CLAIMS CONSTRUCTION

Claim construction is a question of law[1] that involves subsidiary issues of fact.[2] To determine the meaning of a term to a person of ordinary skill in the art ("artisan"), a court looks to the language of the claims, the specification, prosecution history, and extrinsic evidence.[3]

Claims terms are indefinite if they do not, "viewed in light of the specification and prosecution history, inform [artisans] about the scope of the invention with reasonable certainty."[4] A claim is indefinite if an artisan "cannot translate the definition into meaningfully precise claim scope," and, if "an artisan [must] make a separate infringement determination for every set of circumstances [that] are likely to result in different outcomes (sometimes infringing and sometimes not), that construction is likely to be indefinite."[5]

## II.   DISPUTED TERMS

### a.   "Liquid"

A dispute exists regarding the scope of "liquid"—Russell has asked Lifetime whether liquid covers paste adhesives, but the question remains unanswered with even Lifetimes' experts in disagreement. Russell's construction answers the concern by saying yes, liquid includes paste; Lifetime's plain and ordinary meaning leaves the question open. Because many adhesives are referred to as pastes, this issue affects both parties' invalidity and infringement cases—certain

---

[1] *Trustees of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1362 (Fed. Cir. 2016).
[2] *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 839 (2015).
[3] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc).
[4] *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014).
[5] *Halliburton Energy Servs. v. M-I LLC*, 514 F.3d 1244, 1251, 1254–55 (Fed. Cir. 2008).

asserted prior art adhesives are referred to as "thixotropic material," and literature for the adhesive used in Russell's products describes the adhesive as a "paste."[6] The Court must tell the jury whether liquid includes paste so the jury can evaluate invalidity and infringement.

If liquid is supported at all by the intrinsic evidence, it is only by implication and it means something flowable. "Liquid" does not appear in the specification or original claims. A vendor sheet for one of the two disclosed preferred embodiments, Dow Corning Q3-6093, describes it as a "flowable liquid," while the other preferred embodiment, GE D1 SEA-210, is called a "thixotropic paste."[7] Constructions that read out a preferred embodiment are rarely correct.[8] That "liquid" can flow also comports with the patent text: certain dependent claims require the liquid adhesive be "applied by automated equipment," which allows pastes that flow under pressure.

Given the limited intrinsic support, the ordinary understanding of liquid matches Russell's definition. Three dictionaries convey that liquids flow "freely" or "readily."[9] "[D]ictionaries may be helpful [for] commonly understood words."[10] Lifetime's expert Dr. McCarthy agrees, defining liquid to be "something that flows, that is different than a solid or a gas," and any adhesive that comes out of a "caulk tube" is liquid.[11] If a disagreement exists, it is between Lifetime's experts. Lifetime's other expert Mr. Allen testified that an artisan might not think pastes are liquids.[12] He

---

[6] Ex. 24, Dow Corning, Advertisement, at 3 (1969); Ex. 25, Bostik Findley, 70-03A MSDS, § 6.
[7] Ex. 23, Dow Corning, "Information About Specialty Materials for High Technology Applications," at 1 (1998); Ex. 22, GE Silicones, "Preliminary Product Data Sheet," at 1 (1998).
[8] *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013).
[9] Ex. 29, Webster's Ninth New Collegiate Dictionary (1991); Ex. 30, Webster's New World Dictionary of American English, (3d college ed. 1988); Ex. 28, American Heritage Dictionary of the English Language, (3d ed. 1992).
[10] *Phillips*, 415 F.3d at 1314.
[11] Ex. 19, McCarthy Depo. at 47:19-23; *id.* at 49:7–50:5.
[12] Ex. 17, Allen Depo. II at 59:11–21 (answering "I would say probably not. I can't answer for everybody," when asked if liquid includes paste adhesives).

suggests Dr. McCarthy's definition "certainly wouldn't apply in this context," but then adds that any adhesive that can be dispensed is liquid.[13]

Lifetime's competing experts show that without a construction the jury may think one thing when evaluating invalidity, and another for infringement, but this issue cannot be left to the jury.[14] Russell's common-sense construction captures pastes and non-pastes, uses the "flow" language from common definitions, and comports with McCarthy's definition and Allen's testimony.

### b. "Single Layer of…adhesive"/"Single Layer of Adhesive of the Same Material"

The parties dispute the meaning of the terms "single layer of [] adhesive" and "single layer of adhesive of the same material." This dispute turns on claim differentiation. To resolve the dispute, two questions arise: (1) does the doctrine of claim differentiation apply; and (2) is the presumption flowing from the doctrine overcome. To leave these terms without construction, as Lifetime proposes, would leave these legal questions to the jury, in violation of *O2 Micro*.

"The doctrine of claim differentiation create[s] a presumption that each claim in a patent has a different scope," as courts strive to give effect to the language of the patentee.[15] Differences in language and the relation of independent and dependent claims matter.[16] While pragmatic, the doctrine applies most strongly when a party reads a dependent claim limitation into an independent

---

[13] *Id.* at 57:1–6; *id.* at 60:6–24.

[14] *Markman v. Westview Instr., Inc.,* 517 U.S. 370, 390 (1996) ("[T]he importance of uniformity in the treatment [is] an independent reason to allocate all issues of construction to the court.")

[15] *Versa Corp. v. Ag-Bag Int'l Ltd.,* 392 F.3d 1325, 1330 (Fed. Cir. 2004) (internal quotation omitted); *see also K-2 Corp. v. Salomon S.A.,* 191 F.3d 1356, 1364 (Fed. Cir. 1999).

[16] Claim differentiation "is based on the 'common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope.'" *Venturi Jet Sets, Inc. v. Custom Molded Prods., Inc.,* 124 F. Supp. 3d 1195, 1198 (D. Utah 2015). Without construction, the jury may not apply this "common sense" to the term.

claim.[17] The statute requires this strong presumption, as a dependent claim must "specify a *further* limitation."[18] Overcoming the presumption requires "strong contrary evidence, such as definitional language in the patent or clear disavowal of claim scope."[19] The evidence "must be clear and persuasive."[20] Here, claim differentiation raises two such "strong" presumptions.

*Presumption 1:* Where "of the same material" is not recited, the claim broadly allows an adhesive of more than one material. It is a "well-established rule that claims are interpreted with an eye toward giving effect to all terms in the claim."[21] Viewing independent claims 1 and 18 of the '034 Patent side-by-side, an artisan would recognize that claim 1 uses the phrase "single layer of adhesive" while claim 18 uses the narrower phrase "single layer of adhesive of the same material." Even more compellingly, in the '463 Patent, the phrase "of the same material" is added by way of a dependent claim. Claim 1 of the '463 Patent refers to a "single layer of adhesive," without the phrase "of the same material." The additional phrase is added in dependent claim 5 as the only meaningful difference from claim 1.[22]  As this shows, "[c]laim differentiation ... is clearly applicable when there is a dispute over whether a limitation found in a dependent claim should be read into an independent claim, and that limitation is the only meaningful difference between the

---

[17] *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004).

[18] 35 U.S.C. § 112, para. 4 (pre-AIA, emphasis added).

[19] *InterDigital Comms., LLC v. Int'l Trade Comm'n*, 690 F.3d 1318, 1325 (Fed. Cir. 2012).

[20] *Modine Mfg. Co. v. U.S. Int'l. Trade Comm'n*, 75 F.3d 1545, 1552 (Fed. Cir. 1996). *Modine* was overruled on other grounds, but this Court has cited it for continued validity of this proposition. *Lifetime Prods., Inc. v. Correll, Inc.*, 323 F. Supp. 2d 1129, 1142 (D. Utah 2004).

[21] *Digital Vending Servs. Int'l, LLC v. Univ. of Phoenix, Inc.*, 672 F.3d 1270, 1275 (Fed. Cir 2012) (internal quotes omitted); *see also Phillips*, 415 F.3d at 1314 ("[T]he claim in this case refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently mean objects made of steel.").

[22] Claim 5 (unasserted) also adds "and is in direct contact with each of the … frame and the … backboard," but that limit is already textually in claim 1. *Phillips* clarifies that "both asserted and unasserted" claims are sources for interpreting asserted claims. 415 F.3d at 1314.

4

two."[23] The Court must apply different constructions unless Lifetime overcomes the presumption.

No clear definition or disavowal overcomes this first presumption. The written description does not even include the terms "single layer," "layer," or "same material." Likewise, the file history's sparse references to "single layer" only concern an argument between the examiner and Lifetime about whether Figure 1 adequately discloses a "single layer."[24]

The extrinsic evidence confirms the presumption. Lifetime's expert Mr. Allen testified that when the phrase "of the same material" is present, "[i]t expands upon the definition, that the single layer is of one material, not multiple materials," and agreed that where the term "of the same material" is absent, the language allows the adhesive to "be of multiple materials."[25] Differentiation is required in construction. Allowing the jury to apply ordinary meaning risks the jury failing to apply this legally required presumption.

***Presumption 2:*** Claim differentiation raises a second presumption: neither of the two "single layer of adhesive" phrases refer only to non-tape. While the Court previously construed the general term adhesive to exclude double-sided tape, the Court did so before Lifetime asserted the '034 Patent.[26] Lifetime's claim drafting and assertion of independent claims 1 and 18 of the '034 Patent have ripened this issue. Claims 17 and 34 (dependent from claims 1 and 18, respectively) raise the ***presumption*** that the larger phrase "single layer of adhesive" (whether with or without the "of the same material" phrase) is not limited to non-tape.

The ***only*** additional limitation in dependent claims 17 and 34 is that the "adhesive is a non-

---

[23] *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001).

[24] *E.g.*, Ex. 12, App. No. 13/275,174, Response to Final Office Action, at 25-26 (May 5, 2014).

[25] Ex. 17, Allen Depo. II, at 70:19–71:3; *id.* at 71:4–10.

[26] The Court did not address unasserted claim terms, as stated prior to and during the previous claim construction hearing. Doc. 203; Ex. 15, Feb. 5, 2015 Hearing Transcript, 111:10-112:25.

tape adhesive."[27] According to the Federal Circuit, this situation makes claim differentiation not only "clearly applicable,"[28] but "fixed, "long and well-established," and "enjoy[ing] *an immutable and universally applicable status comparatively rare among rules of law*.[29] Thus, the presumption "clearly applies," and the only question is if it is clearly overcome.[30]

Lifetime cannot overcome the presumably different meanings here, as claim differentiation is at its strongest.[31] Again, the presumption can be overcome by "definitional language in the patent or clear disavowal of claim scope," but "the evidence must be clear and persuasive."[32] No definitional language in the Patents compels the term single layer of adhesive (or even adhesive) to exclude tape. To be definitional language, the specification must be extraordinarily clear and unequivocal.[33] The specification in this case *never* uses the terms "single layer of adhesive" or even "layer,"—in fact, it uses the term "adhesive" to refer to tape.[34]

Because claim differentiation "clearly applies," the Court should construe the terms even if the presumption is overcome. As the Court recognized, claim differentiation "is based on the common sense notion that different words or phrases used in separate claims are presumed to

---

[27] *See* Appendix B.

[28] *Wenger Mfg.*, 239 F.3d at 1233.

[29] *D.M.I., Inc. v. Deere & Co.,* 755 F.2d 1570, 1574 (Fed. Cir. 1985) (internal quotations omitted, emphasis added).

[30] *Liebel–Flarsheim*, 358 F.3d at 910.

[31] *Sunrace Roots Enter. Co. v. SRAM Corp.*, 336 F.3d 1298, 1302–03 (Fed. Cir. 2003) ("[Claim differentiation] is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim.").

[32] *InterDigital*, 690 F.3d at 1325; *Modine*, 75 F.3d at 1552; *Lifetime*, 323 F. Supp. 2d at 1142.

[33] *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1368 (Fed. Cir. 2012).

[34] Ex. 1, '111 Pat., 1:48–51 ("Currently, substantial manual labor is used to prepare the acrylic backboard surface and frame surface to receive the adhesive tape….") (emphasis added).

indicate that the claims have different meanings and scope."[35] Without a construction, the jury might not intuitively apply this common sense in their application of the terminology when questions of infringement and validity arise.

The Court should adopt Russell's proposed constructions. They are consistent with the dictionary definitions supplied by Russell,[36] and reflect the claim differentiation issues above.

### c.   "Direct[ly]"

A dispute exists over the term "directly." Russell's proposed construction is plain on its face, and is consistent with the general understanding as shown in dictionary definitions that refer to the absence of "intervening" conditions, factors, or intermediaries.[37] Russell believes this **is** the plain and ordinary meaning. Lifetime chose to insert the word "directly" into its claims. While Lifetime wants to avoid this issue by proposing plain and ordinary meaning without more, its own disclosures demonstrate that Lifetime believes directly means something special. Lifetime's expert disclosure curiously indicates an artisan "would understand the terms and phrases 'direct,' [and] 'directly,'... in accordance with their plain and ordinary meanings, ***which reinforces that the term 'adhesive' as used in the claims of the patents does not include double-sided tape***."[38] That last phrase reveals that Lifetime believes the alleged plain and ordinary meaning of the terms excludes "adhesive" from encompassing tape, but the language itself does not demand this.

In fact, the prior art found in the file history contradicts Lifetime's expert disclosure. Hying,

---

[35] *Venturi Jet Sets, Inc.,* 124 F. Supp. 3d at 1198 (internal quotation omitted).

[36] Ex. 29, Webster's Ninth New Collegiate Dictionary (1991); Ex. 28, American Heritage Dictionary of the English Language (3d ed. 1992).

[37] Ex. 28, American Heritage Dictionary of the English Language (3d ed. 1992) (direct, adj., def. 3).

[38] Ex. 26, *Lifetime's Discloser [sic] of Expert Witnesses Regarding Supplemental Claim Construction*, at 3 (emphasis added).

cited by the examiner, refers to "prior art backboards that **bond** acrylic sheets **directly** to the frame structure using **double sided tapes or adhesives**,"[39] Thus, an artisan in 1999 understood tapes "directly" bonded the backboard and frame. Nothing in the ordinary meaning—and nothing consistent with the definitions from general dictionaries—suggests otherwise. One thing is clear: the parties disagree on the scope of the term's ordinary meaning, so the Court must construe it.

Russell agrees that nothing in the specification or file history constitutes a redefinition or a disavowal of scope of the term "direct[ly]," and that therefore the common understanding of the term should apply. Russell's construction comports with the common meaning in general dictionaries, which Russell has disclosed. Lifetime's view of plain and ordinary meaning has not been articulated beyond a cryptic and self-serving suggestion that it excludes tape. Lifetime's expert, Mr. Allen, could not explain the term without using the term itself, and thus provided no more guidance or support.[40] The term requires construction because of the dispute, and only Russell's construction comports with the evidence before the Court.

### d.   **"[Backboard] Bonding Surface [of the Backboard]"**

Lifetime recently testified that "bonding surface" has "particular meaning," but would have the jury apply only ordinary meaning.  Barely three months ago, Lifetime tendered as its Rule 30(b)(6) representative the patent attorney that has prosecuted the Patents since 2003, and who originally filed 4 of the 5 Patents.  In attempting to distinguish Lifetime's own prior art products, the patent lawyer stated - as Lifetime's corporate testimony - that "bonding surface has **particular meaning** in connection with the . . . '111 patent."[41] This testimony is consistent with the intrinsic

---

[39] Ex. 27, U.S. Pat. No. 5,839,982 (Hying), at 8:42-47 (emphasis added).
[40] Ex. 17, Allen Depo. II at 55:8–19.
[41] Ex. 18, Gilmore Depo. at 152:18-22; *see also id.* at 39:10-21; 153:16-24.

record: prior patent counsel argued that not all adhesively-secured joints have bonding surfaces. He argued a prior art reference showing a "permanent adhesive" as "mounting means" for a backboard, "fails to teach the use of the bonding surfaces found on both a surface of the backboard and the frame in the instant invention. ***These surfaces are important to successful use of the disclosed elastomeric adhesives because bonding surface preparation affects adhesion***."[42] Thus Lifetime has told both the PTO and Russell that the bonding surface has a "particular meaning" in the Patents. Having chosen the term "bonding surface" with "particular meaning," Lifetime should not be permitted to keep that meaning from the jury by the empty mantra of "ordinary meaning."

Lifetime offers no particular meaning for the Court to consider. Russell's construction is supported by the specification and prosecution history above. The specification also states the backboard surface "must be chemically treated" to receive the adhesive.[43] But, discussing printing as an alternative, the specification refers to "printing an image ***on*** the bonding surface with an ***ink which securely bonds to the bonding surface***."[44] The specification differentiates inks from the bonding surface, stating they are "on" and "bonded to" the bonding surface. Because "bonding surface" was used to distinguish prior art, the jury needs to know what a "bonding surface" covers, whether that is a prepared surface, an unprepared surface, or a surface with ink applied.

Failure to adopt Russell's construction will result in additional invalidity concerns for other claims asserted by Lifetime.[45] As shown above, the term "directly" means applying the adhesive directly to the backboard. Claim differentiation shows that claim 1 of the '935 and '550 Patents

---

[42] Ex. 13, App. No. 09/228,325, Response to Office Action at 3-4 (Nov. 17, 2000)(emphasis added)
[43] Ex. 1, '111 Pat., 3:50-51.
[44] Ex. 1, '111 Pat., 4:29-32 (emphasis added).
[45] *See Phillips*, 415 F.3d at 1314 (looking to other claims to determine the meaning of terms).

allows the adhesive to bond in ways other than directly to the backboard, so this must be supported by the written description for the claims to be valid. Indirect bonding has absolutely no support in the specification unless bonding an ink to the backboard bonding surface and then bonding the adhesive to the ink is an "indirect" adhesive bond. While Russell believes even this interpretation may be subject to Section 112 invalidity concerns, Russell's construction is the most logical reading of these claim terms in the context.

     **e.**   **"Adhesive Has/Having" is Indefinite.**

The "adhesive has/having" phrases are indefinite because Lifetime's prosecution statements and expert admit the phrases have more than one meaning, and the proper meaning is not reasonably certain. A plain and ordinary meaning "is inadequate when a term has more than one 'ordinary' meaning," even when an otherwise "ordinary" word is involved in the dispute.[46] The file history demonstrates that the phrase "adhesive [has/having]"[47] has more than one meaning. In order to overcome the examiner's rejection of "adhesive has sufficient flexibility" as indefinite,[48] Lifetime argued that the artisan "would understand" in view of the specification that the "adhesive has sufficient flexibility," "could mean" any of four different things.[49] Lifetime's expert, Mr. Allen, agrees that "adhesive [has/having]" does not have a single plain and ordinary

---

[46] *O2 Micro v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).

[47] The file history for the '034 Patent clarifies that Lifetime equates the scope of the phrases "adhesive having" and "adhesive has." *See* Ex. 7, App. No. 13/270,149, Response to Final Office Action, at 8 (Jan. 30, 2013) ("In connection with Claims 1 and 14, [an artisan] would understand the wording 'having sufficient flexibility and adhesion […]' when read in light of the specification. For example, [an artisan] would understand this wording could mean the adhesive has sufficient flexibility and adhesion….").

[48] Ex. 8, App. No. 13/275,174, Non-Final Office Action, at 2-3 (Mar. 2, 2012).

[49] Ex. 10, App. No. 13/275,174, Response to Office Action, at 11 (Sept. 4, 2012).

meaning to the artisan.[50] To Mr. Allen, "adhesive [has/having]" can mean either what the properties *are* in the adhesive that is the subject of the claim, or what properties the adhesive is "*imparting*" to something else in the assembly.[51] Claim construction presumes that the same term has the same meaning across claims unless the specification and prosecution history clearly show that the term has different meanings in different claims.[52] Here, the file history—reinforced by Lifetime's expert—makes it clear that each phrase could have at least *two* meanings.

"[A] claim is indefinite if its language might mean several different things and no informed and confident choice is available among the contending definitions."[53] No "informed and confident choice" presents itself for a single construction of "adhesive [has/having]" across all claims among the multiple suggested meanings supplied by the intrinsic evidence and Lifetime's expert. "Adhesive has" cannot mean the adhesive "provides,"[54] as demonstrated by claims 1 and 12 of the '034 Patent.[55]  Reading claim 1 alone, the artisan could surmise that the adhesive might impart or provide some aspect of flexibility to the bond joint. However, dependent claim 12 and claim differentiation bar such an interpretation by adding a dependent claim about what an adhesive

---

[50] Ex. 17, Allen Depo. II at 23:5-21.

[51] *Id.* at 29:19-33:11.  According to Allen, "*In some cases* it's something that the adhesive *has. In some cases* it's what the adhesive *provides*.*" Id.* at 42:13-43:11 (emphasis added). "Imparting" is Allen's word, and it means "adhesive providing." *Id.* at 28:19-29:18.

[52] *Paragon Solutions, LLC v. Timex Corp.,* 566 F.3d 1075, 1087 (Fed. Cir. 2009).

[53] *Media Rights Techs., Inc. v. Capital One Fin. Corp.,* 800 F.3d 1366, 1371 (Fed. Cir. 2015) (internal quotation omitted).

[54] Such an interpretation would also impermissibly change passive verbs—"has" and "having"—to the active verb "provides," which would change the meaning of the claims.

[55] Claim 1 of the '034 Patent recites: "A basketball backboard comprising … a single layer of adhesive …  *the adhesive having* sufficient flexibility in the bond ….*"* (emphasis added). Claim 12, which depends from claim 1, further limits the claim to one "wherein the *adhesive provides sufficient flexibility in the bond*…." Claims 35 (independent) and 37, and 39 (independent) and 41 of the '034 have the identical has/provides dependence relationship for the adhesive and "flexibility in the bond to dissipate."

provides. A presumption arises that these two claims have a different scope—"adhesive [has/having]" cannot just mean "adhesive provides."[56]

Because "adhesive provides" is unavailable as a construction, the scope of "adhesive [has/having]" is not reasonably certain. The phrase is often used to describe mechanical properties of the adhesive, as shown by claims 1 and 28 of the '463 and 18 of the '034, but these are not inherent qualities of an adhesive—they only exist in the context of additional objective information about the bonded materials, namely, how and where the adhesives are used.[57] Whether an "adhesive has" sufficient flexibility or sufficient adhesive strength, or some combination of the two, depends upon at least two things: the design of the bond joint (*i.e.*, the bonded substrates, the adhesive, and their configuration), and the performance testing requirements for the bond joint.[58] However, these claims do not objectively inform the artisan about the strength or flexibility being measured, they also lack information concerning the assembly configuration and materials, and they do not limit, or even describe, how to test the adhesive for "having" sufficient performance.[59] Without this information, and because these characteristics do not inherently exist in an adhesive, the actual meaning of "adhesive [has/having]" is not reasonably certain and thus is indefinite.[60]

**f.   "Elastic Bonding" Is Indefinite.**

An artisan has no guidance from the intrinsic record for what "elastic bonding" may mean—it is not discussed anywhere in either the specification or in the file histories across these patents. While the Court may look to the claims for guidance, principles of claim differentiation

---

[56] *Venturi Jet Sets, Inc.*, 124 F. Supp. 3d at 1198 (internal quotation omitted).
[57] Ex. 34, Reitman, Decl. ¶ 16.
[58] *Id.* at ¶ 18.
[59] *Id.* at ¶¶ 18-21.
[60] *Nautilus*, 134 S. Ct. at 2129.

direct that "bonding" is not equivalent in scope to the mere presence of an "elastomeric adhesive." While several of the claims that contain the "elastic bonding" limitation do so in the context of "an elastomeric adhesive that provides elastic bonding,"[61] claim 27—containing no limitation as to the type adhesive—also provides that "the cured adhesive provides elastic bonding." Likewise, "elastic bonding" must be differentiated from "sufficient flexibility," as both "elastic and high strength bond" and "sufficient flexibility" appear in claim 45 of the '463. Likewise, claim differentiation between claims 45 and 62 of the '463 require that "elastic bonding" is different in scope from "sufficient flexibility to dissipate."

The word "elastic bonding" is without a reasonably certain scope. To the artisan, the words "elastic" and "dissipate" refer to different—and opposite—physical characteristics in an adhesive.[62] While "dissipate" connotes the loss or transfer absorbed energy, "elastic" means the return of a significant portion of absorbed energy, mechanically distinct adhesive behaviors.[63] But the specification requires the adhesive bond to dissipate energy in order for the claimed assembly to work—a "problem" to be successfully overcome is: "[T]here *must be* sufficient flexibility in the bond to dissipate the impact energy from the backboard to the frame."[64] Thus, claims containing the limitation of "elastic bonding" must also dissipate energy—*i.e.*, the adhesive bond must have some combination of the two. Thus, the artisan would understand that the term "elastic bonding" does not mean purely elastic, but would not know how much elasticity, as opposed to

---

[61] '463 Pat., claims 32-36, 44, 62.

[62] Ex. 34, Reitman Decl., ¶ 22.

[63] *Id.* Indeed, Lifetime's expert Dr. McCarthy compared the ordinary meaning of "elastic" to rubber bands, which obviously store energy when stretched instead of dissipating it. Ex. 19, McCarthy Depo. at 70:21–71:7.

[64] Ex. 1, '111 Pat., 1:36-40 (emphasis added).

dissipation, needs to be provided. The "elastic bonding" claims are indefinite because they do not inform the artisan how or where to draw that line, providing no objective boundaries for how much elasticity is needed. Therefore the artisan cannot evaluate whether the use of a particular adhesive is in or out of the group of adhesives that would form an "elastic" bond.[65]

According to Lifetime's expert, some adhesives—even elastomeric adhesives—are more elastic than others.[66] Without any objective parameters for how much elasticity is necessary in order to create "elastic bonding" between the frame and backboard "to allow the basketball backboard to be used for playing the game of basketball," an artisan would not know which adhesives provide enough elasticity for bonding (within the scope of the claims) and which ones do not (free for use without infringing).[67] Allen's expert testimony—Lifetime's only source of evidence for its proposed construction—perhaps best frames the indefiniteness issue:

> Q We talked a few minutes ago that there are adhesives that provide more elastic in the bond and less elastic in the bond. And my question is, would [an artisan] in January 1999 know when an adhesive fell below the line of elastic that would be considered an elastic bond or above that line to know when it was an elastic bond?
> A I would say they wouldn't, no.[68]

Furthermore, the elastic response of an adhesive is heavily dependent upon environmental and configuration factors that are not set forth in these claims. For instance, the faster an adhesive is stress loaded, the more elastic it will be, and a slower loading of stress will cause more dissipation,[69] yet these claims give no indication as to rate of loading relative to how "elastic" the bonding needs to be. The configuration of the adhesive bond joint also greatly affects the elasticity

---

[65] Ex. 34, Reitman Decl.. at ¶ 24.
[66] Ex. 17, Allen Depo. II at (84:17-88:18).
[67] Ex. 34, Reitman Decl.. at ¶ 24.
[68] Ex. 17, Allen Depo. II at (88:9-18).
[69] Ex. 34, Reitman Decl. ¶ 25.

of the bond—a thinner bond tends to be more rigid and less elastomeric, and, conversely, as the adhesive bond thickens, it becomes more dissipative and stretchy, and less elastic.[70] Yet, these claims do not define the bond joint configuration parameters. Furthermore, the colder the environment, the more elastic an adhesive will be, and, conversely, the warmer the environment, the less elastic it will be.[71] Because these claims with the "elastic bonding" limitation tell the artisan nothing about environmental conditions, an adhesive that is more elastic in cold conditions, but less so in hot conditions, may provide "elastic bonding" in one environment (cold) but not in another (hot). Therefore, the artisan cannot be reasonably certain—without the parameters of load rate, bond joint configuration, and environment—as to whether an adhesive will or will not provide "elastic bonding" in any particular backboard frame assembly, making the limitation indefinite.[72]

Lifetime's only support for its proposed definition is the personal understanding of its expert, Allen, which has no basis in the specification or the file histories.[73] According to Allen, the "elastomeric properties" of the adhesive include elongation, stiffness (shore hardness), and compression.[74] All of these characteristics are measurable.[75] However, they can be measured quantitatively only if the configuration of the bond joint—specific adherends, bond design, environmental conditions, and loading parameters—are provided.[76] Therefore, if "elastic bonding" refers to these elastomeric properties of the adhesive, it is possible to describe the elastomeric properties in terms of quantitative metrics and, therefore, provide objective boundaries on the

---

[70] *Id.*
[71] *Id.*
[72] *Halliburton*, 514 F.3d at 1251.
[73] Ex. 17, Allen Depo. II. at 73:24-74:4; 75:22-76:3.
[74] *Id.* at 77:18-80:11.
[75] *Id.* at 84:7-12, Ex. 19, McCarthy Depo. at 76:1–13; Ex. 34, Reitman Decl. at ¶ 26.
[76] Ex. 34, Reitman Decl. at ¶ 26.

scope of what is, and what isn't elastomeric.[77] However, none of that information is provided in the elastic bonding claims, leaving the artisan to guess as to whether an adhesive would provide "elastic bonding" in any given basketball backboard configuration—and thereby fall within the scope of these claims of the patents—or it would not. The scope of elastic bonding is not reasonably certain, and it renders the claims containing that limitation indefinite.

### g.   "Securely Connect" is Indefinite.

The term "securely connect" is indefinite because it carries a meaning distinct from other "sufficiency terms" and has no reasonably discernible bounds. Beginning with the claims, claim 1 of the '034 recites in part that the adhesive has "sufficient flexibility and adhesion" for playing the game of basketball. Claim 12, which depends from 1, adds the further limitation that the adhesive "provides sufficient adhesion to securely connect the backboards and the frame."[78] In claim 12, this is the only meaningful additional limitation compared to claim 1 (a "sufficient flexibility…to dissipate" limitation also appears in claim 12, but the dissipation requirement is also already present in claim 1). Thus, a strong presumption arises that these two claim terms have different meanings.[79] Lifetime also states that a "secure bond is a *critical factor*" for making a backboard, apart from the need for sufficient adhesion, while at the same time, Lifetime contrasts "secure adhesion" as being opposite to "ample flexibility," without defining the limits of either term.[80]

---

[77] *See Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) (holding *Nautilus* requires "objective boundaries"); *Halliburton*, 514 F.3d at 1255-56 ("A patent drafter could resolve the ambiguities of a functional limitation in a number of ways. For example, the ambiguity might be resolved by using a quantitative metric (e.g., numeric limitation as to a physical property) rather than a qualitative functional feature.")

[78] Claims 18 (independent) and 29, 35 (independent) and 37, and 39 (independent) and 41 in the '034 raise the same issue.

[79] *See Versa Corp.*, 392 F.3d at 1330; *Liebel-Flarsheim Co.*, 358 F.3d at 910.

[80] Ex. 11, App. No. 13/275,174, Response to Office Action at 30 (Nov. 12, 2013) (emphasis added)

Also, following an indefiniteness rejection, Lifetime failed to take the opportunity to provide clarity as to the degree of connection required, and instead responded with mere possibilities, stating an artisan "would understand ***this wording <u>could</u> mean*** the adhesive provides sufficient adhesion to securely connect the backboard and the frame."[81] In fact, after leaving this ambiguity in place, Lifetime made the phrase even more uncertain by selectively adding the clause "to allow the basketball backboard to be used for playing the game of basketball" to some of the "sufficient adhesion to securely connect" clauses, but not others.[82]

Other Lifetime statements import further meanings into the claim term. For example, patent counsel for Lifetime informed the PTAB that double-sided tape "doesn't provide a secure connection" between the acrylic and the frame, meaning that the claim limitation requires something more than that of double-sided tape.[83] Counsel further stated a "secure connection" is "required for proper rebound and performance," thus linking this "secure connection" to some amount of rebound.[84] Counsel also implies that a "secure connection" requires a short bond gap, and that an artisan would ***not*** understand silicone rubber to imply a "secure connection."[85]

Lifetime's expert testimony provides no certainty, but rather reinforces the uncertainty about this term. When asked about the ordinary meaning of "securely connect," Allen could only circularly define it, stating "that it connects securely, not insecurely connecting."[86] When asked how much adhesion the artisan in 1999 would know was needed to "securely connect" the

---

[81] Ex. 6, App. No. 13/270,149, Response to Office Action, at 9 (June 11, 2012) (emphasis added).
[82] *Compare* Ex. 11, App. No. 13/270,174, Response to Office Action, at 4-6 (Nov. 12, 2013), with Ex. 35, App. No. 13/270,149, Response to Office Action, at 3, 5, 7-9 (Sept. 25, 2013).
[83] Ex. 14, App. No. 09/228,325, Record of Oral Hearing, at 3:13-18 (Apr. 13, 2010).
[84] *Id.* at 9:9-11.
[85] *Id.* at 6:13-14, 7:21-23, 9:9-11.
[86] Ex. 17, Allen Depo. II, 94:23-95:19, 96:9-14.

backboard to the frame, Allen opined—in conflict with the intrinsic evidence—that it would be the same amount as the unspecified double-sided tape used in prior art backboards.[87] Allen admits that an artisan in 1999 would have to play basketball on an adhesive backboard to determine if the adhesive securely connects the backboard to the frame, and that how the artisan plays the game of basketball, who plays the game of basketball, and where the game of basketball is played on the backboard will all affect whether or not the artisan believes he has found an adhesive that will securely connect.[88] When asked how the artisan would know how much basketball would have to be played for the artisan to determine whether an adhesive had the requisite adhesion to "securely connect," Allen responded: "Well, I think it would be pretty subjective on his part as to what he wants to do to determine that he's got something viable."[89] Yet, these claims tell the artisan nothing about who, where, when or how much basketball is to be played to determine if the adhesive will securely connect, such that he could find "meaningfully precise claim scope."[90] Lifetime sought ambiguity with "securely connects." The Court should recognize this and find the term indefinite.

       **h.  The Sufficiency Terms are Indefinite.**

      This Court previously addressed certain terms involving the concept of "sufficiency" of the adhesive ("Sufficiency Terms") for the game of basketball. The claims asserted at that time had three Sufficiency Terms; now there are twelve. Russell maintains that the new (and the previously-construed) terms are indefinite, while Lifetime still asserts plain and ordinary meaning. The Court rejected both positions, finding that the terms deserved construction (rather than "plain

---

[87] *Id.,* 98:12-99:15.
[88] *Id.* at 146:5-10; 147:25-148:5, 149:1-151:5, and 151:19-152:11.
[89] *Id.* at 103:19-21.
[90] *Halliburton*, 514 F.3d at 1251.

and ordinary meaning"). Russell also contends that the new Sufficiency Terms are indefinite for all of the reasons that the previously-construed Sufficiency Terms were, and specifically incorporates its previous arguments by reference from Doc. 242 at 22-35.

In addition to the previously-argued reasons, three new factors show that the Sufficiency Terms are indefinite: (a) new issues of claim differentiation, (b) new facts, and (c) the expansive set of similar-but-different terms. First, the doctrine of claim differentiation prevents the same analysis from the prior claim construction order ("Prior Order") from applying today. The Prior Order found that the Sufficiency Terms included the concept of basketball "at a home." Claim differentiation now forecloses a similar holding. Specifically, in the '463 Patent, independent claims 1, 28, and 45 are respectively followed by dependent claims 25, 41, and 59, in which the *only* additional limitation is that the board is a residential board that looks like a professional board. The "strongest" presumption, one that is a "fixed rule," flows from this type of claim differentiation, demonstrating that the independent claims are not limited to residential boards.[91]

Given the discussion of "securely connect" above, another claim differentiation presumption arises that affects the construction of all Sufficiency Terms that refer to "adhesion." In the intrinsic evidence, Lifetime told the PTO that it is "critical" the backboard have a "secure connection" to the frame to successfully make a basketball backboard.[92] The phrase "sufficient adhesion to securely connect" in the claims therefore expressly specifies this critically necessary magnitude of adhesion (whatever it may be). This limitation frequently appears in dependent

---

[91] Lifetime's suggestion that the prior constructions provide adequate guidance to adopt the plain and ordinary meaning is wrong. This legal presumption was not taken into account before, and must be now. *Liebel-Flarsheim Co.*, 358 F.3d at 910; *D.M.I.,* 755 F.2d at 1574.

[92] Ex. 11, App. No. 13/275,174, Response to Office Action, at 30 (Nov. 12, 2013).

claims below independent claims that already require a more generic recitation of sufficient adhesion[93]— triggering the "strongest" presumption of claim differentiation.[94] The more generic, independent limitations referring to "sufficient adhesion" must mean something *different* from a magnitude of adhesion to "securely connect" (*i.e.*, they mean something other than the amount of adhesion critically necessary), but *what* they mean is now uncertain.  There is no basis for determining how much they differ from "securely connect." Simply put, in view of "securely connect," neither Lifetime nor the intrinsic record provides any way to determine a meaning for these terms with reasonably certain boundaries.

Second, new Lifetime testimony shows no reasonably certain understanding exists of either (a) the necessary level of adhesion or flexibility, or (b) how one would even evaluate adhesion or flexibility. Previously, Lifetime's counsel advised the Court that an artisan would test the prior-used VHB tape to measure the needed strength and flexibility, and that using a VHB benchmark "had been happening well before" the inventor's activity.[95] Subsequently, Lifetime argued the opposite to the PTO during reexamination appeals, stating that even with the inventor's knowledge of VHB, the required amount of "*flexibility was unknown*" and the inventor had to "determine[ ] what that flexibility was."[96] This new factual disclosure is contrary to Lifetime's previous arguments to the Court and are in the file history now—which means it has greater importance for claim construction.[97] This admission of "unknown" flexibility prior to the inventor's work aligns

---

[93] *E.g.*, '034 Pat., claims 1 versus 12; 35 versus 37; 39 versus 41; and 43 versus 48 and 50.
[94] *Liebel-Flarsheim Co.*, 358 F.3d at 910; *D.M.I.*, 755 F.2d at 1574.
[95] Ex. 15, Feb. 2, 2015 Hearing Transcript, at 17:5-18; 139:14-20.
[96] Ex. 31, Rex. Nos. 95/002,377, 95/002,381, Nov. 19, 2015 Hearing Transcript, 30:9-22.
[97] *Phillips*, 415 F.3d, at 1315 ("[T]he best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history.").

with the remaining intrinsic record since, even if the needed flexibility could be known from the VHB tape in use prior to 1999, the specification and file history do not disclose that to the artisan. The specification refers to two brands of VHB tape, but does not tell which grade of tape was used.[98] An artisan reading the specification cannot obtain any idea what the benchmark tape was. Thus, the all-important "benchmark" that Lifetime spoke of to this Court **remains unknown**.[99]

These considerations raise three reasons the Sufficiency Terms are indefinite: subjectivity, functionality, and multiplicity.

Subjectivity:  The Patents do not disclose the "benchmark" VHB in any detail, so the artisan has only individual subjective judgment as to the needed strength and flexibility in a bond joint. Lifetime's expert confirms that the artisan reads these limitations subjectively: Mr. Allen stated that the artisan could only evaluate whether the adhesive met the limitations by playing basketball on it.[100] When asked how many games the artisan would think had to be played to complete the test, Mr. Allen said, "I can't answer that question in the context of that broad section of people that would be considered skilled in the art."[101] Critically, Mr. Allen agreed that different artisans will conduct that testing differently, which would affect whether the adhesive qualifies.[102] In other words, these limitations merely invite the artisan to use his own opinion about what makes an adhesive "sufficient" or what is "securely connected". Because the artisan is left with only

---

[98] Ex. 1, '111 Pat. 4:38-40. Moreover, the numeric test results in the specification lack context, do not consider impact dissipation, do not indicate what is a passing or failing value.

[99] *See also* Doc. 242, at 28-31.

[100] Ex. 17, Allen Depo. II at 146:05-147:08.

[101] *Id.* at 141:18-20; *id.* at 142:21-143:07 (noting tests may be for one game, or "commercial life").

[102] *Id.* at 152:12-152:25 ("152:12 Q Is every person of ordinary skill in the art going to know to conduct the test the same way? A No. Q And how the person of ordinary -- how a person of ordinary skill in the art conducts the test may affect whether he believes he's found a sufficient adhesive, correct? A That's correct.")

subjective judgment of "sufficiency," the term is indefinite.[103] Lifetime's sole disclosed test—the torque test described at 4:52–53—is too vague to provide objectivity.[104] Likewise, Lifetime's shifting litany of internal tests do not demonstrate an artisan's knowledge of sufficiency.[105]

The strongest illustration of how untethered the Sufficiency Terms are from any objective measure or boundary is Lifetime's own infringement contentions. Those contentions state that Russell's backboards meet the various sufficiency limitations because Russell *intends* for them to work for basketball and does not intend for them to break.[106] Lifetime says nothing about objective performance at all, and it cites no testing by either party. "Subjective intent = sufficient," says Lifetime. But controlling law holds that relying on subjective intent makes a term indefinite.[107]

Functionality:  In addition to this subjective element, the Sufficiency Terms also rest on a purely functional idea: an adhesive is sufficient if it works for the game of basketball. Russell previously asserted this argument,[108] but the new claims of the '463 and '034 Patents raise additional considerations of functionality in view of the Court's Prior Order. Claim 18 of the '034 Patent is the perfect illustration: it claims a backboard, a frame, and a single layer of adhesive having "sufficient" qualities between the frame and backboard. The claim requires *no* bond gap spacers, *no* defined bond gap, *no* elastomeric properties, or any other specific property of the adhesive.[109] The core of the invention claimed is a non-tape adhesive that can be used to bond a

---

[103] *Dow Chem. Co. v. Nova Chems. Corp.*, 803 F.3d 620, 635 (Fed. Cir. 2015).

[104] Doc. 242 at 30–31.

[105] *Id.* at 26–27, 31–33.

[106] Ex. 32, Plaintiff Lifetime Products. Inc.'s Infringement Contentions, Ex. 1, at 1, 3.

[107] *Interval*, 766 F.3d at 1371-72; *Dow,* 803 F.3d at 635; *Halliburton*, 514 F.3d at 1254-55.

[108] Doc. 242, at 22-23, 31-35.

[109] The Court had previously looked to the use of these other limitations as possible sources of objective boundaries for the sufficiency terms. Doc. 261 at 22. Claim 18 of the '034 Patent now forecloses that understanding.

backboard to a frame. Nothing novel or nonobvious is claimed about the backboard, the frame, or the materials used in them. The use of a "sufficient" adhesive is the only possible novelty. For Claim 18, any glue that works falls within the claim, regardless of any number of other critical variables that affect the performance of the basketball backboard system. The undisputed evidence from Lifetime's witnesses[110] and Russell's expert[111] is that several factors affect the amount of adhesion, flexibility, and dissipation required of a backboard, including the material of the backboard, the frame geometry, the quantity of adhesive used, and the weight of the backboard. Yet none of these factors or their effect are recited in the claims.

The Federal Circuit forbids such purely functional claiming. If multiple conditions not recited in the claim affect whether a product is "adequate" (or sufficient), such that it "requires that an artisan make a separate infringement determination for every set of circumstances . . ., [and] are likely to result in different outcomes (sometimes infringing and sometimes not), [then] that construction is likely to be indefinite."[112] What matters is an artisan's ability to identify ***reasonably certain boundaries***.[113] With so many variables at play, the Patents cannot attribute successful function to the adhesive, yet that is exactly what the Sufficiency Terms aim to do.

---

[110] Ex. 16, Allen Depo. I at 64:3–24 (discussing material thickness); *id.* at 73:7–75:13 (discussing backboard weight and support systems); Ex. 20, Petrie Depo. at 95:23–100:5 (discussing the role of cure time, temperature, mixing, bond gap, joint design, substrate material, modulus, acrylic toughness, and acrylic thickness); Ex. 21, Van Nimwegen Depo. at 64:20–65:8 (discussing using modified acrylic to be "more impact resistant").

[111] Ex. 34, Reitman Decl. at ¶¶28-29.

[112] *Halliburton*, 514 F.3d at 1254-55.

[113] "[T]he fact that [a patentee] can articulate a definition supported by the specification" does not render the claim definite if an artisan "cannot translate the definition into meaningfully precise claim scope." *Id.* at 1251.

23

Lifetime's answer to all of this is that an artisan somehow just knows whether a particular assembly will be sufficient for playing basketball.[114] This assertion fails to overcome the functional claiming problem because indefiniteness looks at claim *scope*, not whether a particular embodiment falls within the scope.[115] Merely saying that an artisan could identify a particular example that falls within the term does not make an indefinite term definite.

Multiplicity:   Lifetime's multitude of claims creates an aggregated problem beyond those inherent in any one term. The five Patents now include ***217*** claims for what Lifetime described as a "simple invention," using glue instead of tape.[116] The Patent Act requires that the claims "particularly point[] out and ***distinctly claim[]*** the subject matter,"[117] but 217 claims obscure the invention. "More than one claim may be presented provided they differ substantially from each other and are not unduly multiplied,"[118] but 217 claims for a 4-column patent claiming the replacement of tape with glue is undue multiplication. "[W]here a specification by ambiguity and a needless multiplication of nebulous claims is calculated to deceive and mislead the public, the patent is void;"[119] 217 claims is clearly needless multiplication, creating a web of overlapping and conflicting Sufficiency Terms that this Court and other competitors must try to decipher.

Lifetime has now advanced 12 different sufficiency terms. To understand these Patents, an artisan must distinguish between attributes that an adhesive "provides" versus those that the adhesive "has," except that sometimes an adhesive can both have and provide the same thing. An

---

[114] Doc. 225 at 9.
[115] *Nautilus*, 134 S. Ct. at 2124.
[116] Ex. 15, Feb. 2, 2015 Hearing Transcript, at 18:9-24.
[117] 35 U.S.C. § 112, para. 2 (pre-AIA, emphasis added).
[118] 37 C.F.R. § 1.75(b).
[119] *Carlton v. Bokee,* 84 U.S. 463, 472 (1873).

artisan must also understand how to distinguish between "sufficient adhesion" and "securely connect." Even if an artisan could figure out what one or two of these terms means, the artisan cannot figure out how they differ from each other. Far from concisely claiming a novel invention, the overlapping claims of these patents lead inevitably, and impermissibly, to confusion.[120] To get a sense of exactly how much these terms overlap, Appendix C lines up the variations just in sufficiency terms using "dissipate" to show where they are the same and where they differ. An artisan cannot possibly navigate this quagmire.

Lifetime chose these overlapping terms, and now tells the Court their meanings are plain and ordinary. At the very least, the Court should make Lifetime enter into its own web of claims and try to decipher them—which is hardly unfair, given that the rest of the marketplace must try and do the same on pain of infringement. Other courts have required patentees to do the same.[121] As Lifetime cannot plainly tell the Court what these terms mean without simply repeating the terms, their indefiniteness is laid bare.

## CONCLUSION

Russell respectfully requests the Court provide constructions to the jury as set forth herein.

**Dated:** April 22, 2016

By: _/s/*Jeff Dyess*_____
Nathan W. Johnson
Jeffrey D. Dyess

---

[120] *Ind. Pneumatic Tool Co. v. Chicago Pneumatic Tool Co.,* 96 F. Supp. 70, 74 (N.D. Ill. 1951).
[121] *See Maytag Corp. v. Electrolux Home Prods., Inc.,* 411 F. Supp. 2d 1008, 1037 (N.D. Iowa 2008) (stating "[i]t has been this court's experience that parties in patent cases rarely agree on the 'ordinary meaning…' so that asserting that such a meaning should apply, without further construction, merely begs the question of what that meaning is," and citing prior order requiring plaintiff to explain its plain and ordinary meaning); Ex. 33, Letter Order at 2, *Sucampo, AG v. Dr. Reddy's Labs., Inc.*, No. 14-7114 (MAS) (Mar. 4, 2016 D.N.J.) (unpublished) (ordering plaintiff to explain its asserted "plain and ordinary meaning," and citing *Annotated Patent Digest*).

Jacob W. Neu
J. Thomas Richie
BRADLEY   ARANT   BOULT   CUMMINGS
LLP
1819 Fifth Avenue North
Birmingham, AL 35203
T: 205-521-8000
F: 205-521-8800
njohnson@babc.com
jdyess@babc.com
jneu@babc.com
trichie@babc.com

Edgar R. Cataxinos
MAGLEBY CATAXINOS GREENWOOD
170 South Main Street, Suite 1100
Salt Lake City, UT 84101
T: 801-359-9000
F: 801-359-9011
Cataxinos@mcgiplaw.com

Attorneys for Defendant Russell Brands, LLC

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 22nd day of April, 2016, a true and correct copy of the foregoing was sent via email to:

Kirk Harris
Jared Braithwaite
David Wright
Taylor Wright
MASCHOFF BRENNAN
201 South Main Street, Suite 600
Salt Lake City, UT 84111
Attorneys for Plaintiff LIFETIME PRODUCTS, INC.


/s/  *Jeff Dyess*

BRADLEY ARANT BOULT CUMMINGS LLP

27